[No. 31710. Department One. July 5, 1951.]

Ross Largent, *Appellant,* v. Rex H. Ritchey *et al.,*
*Respondents.*[1]

[1]Reported in 233 P. (2d) 1019.

*Simmons & McCann,* for appellant.

*Post & McLeod,* for respondents.

HILL, J.—Ross Largent, a real-estate broker doing business as Largent Realty Company, sues for a commission. The defense is that the agreement for a commission was not sufficiently definite as to the amount thereof to support a judgment, and that, in any event, the agreement was rescinded by mutual consent. The principal question involved, aside from the asserted ambiguity with reference to the amount of the commission, is whether a salesman for the real-estate broker had apparent authority to rescind an agreement for a commission that had been earned.

The defendants, Mr. and Mrs. Rex H. Ritchey (respondents here), had listed a residence for sale with Largent. One of Largent's salesmen, J. H. LaPoint, showed the Ritchey property to Mr. and Mrs. Richard S. Campbell, who made a cash offer of fifteen thousand dollars and gave La-Point a check for one thousand dollars as earnest money. The Ritcheys refused that offer but expressed willingness to sell for $15,625, and the Campbells agreed to pay that amount. LaPoint prepared an "Earnest Money Receipt and Agreement" giving the terms of sale, below which, on the same sheet, was a "Commission Agreement," which Mr. and Mrs. Ritchey signed and which read as follows:

"Seattle, Washington, November 10, 1949

"The undersigned hereby agrees to pay a commission of
............5%..................Dollars ($............................) to the above agent
for services. In the event earnest money is forfeited, it
shall be apportioned to seller and agent equally, provided
the amount to agent does not exceed the agreed commis-
sion."

This agreement was on a printed form, and the date and
"5%" were typewritten in. The "above agent" was de-
scribed in the "Earnest Money Receipt and Agreement" as
"Largent Realty."

As in *Richey v. Bolton*, 18 Wn. (2d) 522, 140 P. (2d) 253,
this did not purport to be a contract of employment, but
was a direct promise to pay for services already performed,
as evidenced by the "Earnest money Receipt and Agree-
ment."

The Campbells thereafter told LaPoint that they could
not obtain a loan from the Federal housing authority large
enough to make it possible for them to pay the purchase
price in cash, and that "they could not go through with the
deal."

The only disputed fact is whether the Ritcheys author-
ized the return of the check for earnest money to the
Campbells, or whether LaPoint returned it without their
knowledge or consent. In any event, after its return to the
Campbells, LaPoint, at the Ritcheys' request, wrote

"Cancelled
Largent Realty Co.
 J. H. LaPoint"

on the Ritcheys' copy of the "Earnest Money Receipt and
Agreement."

It is conceded that, immediately thereafter, the Camp-
bells purchased the property from the Ritcheys for the
agreed price of $15,625, the transaction being handled
through a real-estate escrow company.

It is argued, and we quote from respondents' brief:

"The earnest money receipt contained the following lan-
guage: 'agrees to pay a commission of 5% Dollars ($..............
............................).' No evidence was introduced by plaintiff-
appellant to explain this obvious ambiguity."

There was a time when an agreement to pay a commission of "5% Dollars" might have been regarded as ambiguous, but rapidly approaching reality could be considered to have displaced the ambiguity. However, the parties will not be presumed to have intended to enter into an agreement that is contrary to public policy, *i.e.*, "to pay a commission of 5% Dollars." See Congressional joint resolution, June 5, 1933 (48 Stat. 112), declaring that provisions requiring "payment in gold or a *particular kind of coin or currency*" are against public policy. This we assume would apply to "5% Dollars." See, also, the gold clause cases, *Norman v. Baltimore & Ohio R. Co.* and *United States v. Bankers Trust Co.*, 294 U. S. 240, 79 L. Ed. 885, 55 S. Ct. 407, 95 A. L. R. 1352; *Nortz v. United States*, 294 U. S. 317, 79 L. Ed. 907, 55 S. Ct. 428, 95 A. L. R. 1346; and *Perry v. United States*, 294 U. S. 330, 79 L. Ed. 912, 55 S. Ct. 432, 95 A. L. R. 1335.

The spacing and the placing of the "5%" in the printed form of commission agreement in the manner heretofore indicated has a bearing on the meaning of the parties. It seems clear to us that the parties did not contemplate payment of "5% Dollars," that they ignored the word "Dollars" and the sign therefor and agreed "to pay a commission of 5%"; and that it was five per cent of the purchase price referred to in the "Earnest Money Receipt and Agreement" seems equally obvious. Only a perspective "clouded by the unexpected chance of gain or self-interest" (*Carnation Lbr. & Shingle Co. v. Tolt Land Co.*, 103 Wash. 633, 639, 175 Pac. 331) could see anything ambiguous in the "Commission Agreement" when construed with the "Earnest Money Receipt and Agreement" which preceded it on the same page. There is, after all, no hard and fast rule against applying common sense to situations of this kind. As said in 12 Am. Jur. 754, Contracts, § 231:

"That interpretation should be adopted which, under all the circumstances of the case, ascribes the most reasonable, probable, and natural conduct to the parties. Business contracts must be construed with business sense as they naturally would be understood by intelligent men of affairs

and in the same sense as is uniformly attached to them by the business world." (Quoted with approval in *Carroll Construction Co. v. Smith*, 37 Wn. (2d) 322, 223 P. (2d) 606.)

■ Looking at the supposedly ambiguous "Commission Agreement" appended to the "Earnest Money Receipt and Agreement," we encounter no difficulty in reaching the same conclusion as did the trial court, *i.e.*, that the Ritcheys agreed to pay a commission of five per cent to Largent on the sale price of the property.

■ It is equally clear that, when both the Ritcheys and the Campbells had agreed to a sale price and indicated that fact on the "Earnest Money Receipt and Agreement," Largent was entitled to his commission unless the Campbells failed to complete the purchase and the Ritcheys elected to keep the one thousand dollar earnest-money payment as liquidated damages, in which event Largent would be entitled to half the earnest money, or five hundred dollars. As we said in *Ollinger Co. v. Benton*, 156 Wash. 308, 312, 286 Pac. 849:

"The law is so well settled as to require no citation of authority that, where a broker has produced a customer who is accepted by the other side and who enters into a binding and enforceable contract for the exchange or sale of property, he has earned his commission."

And in that case we quoted with approval 4 R. C. L. 310, Brokers, § 50, as follows:

"The authorities are practically unanimous in holding that unless the broker and his employer have expressly stipulated to the contrary the broker is entitled to his compensation upon the completion of the negotiations he undertook irrespective of whether or not the contract negotiated is ever actually consummated, so long as the failure to carry it through to a successful completion is not due to any fault of the broker."

See 8 Am. Jur. 1094, Brokers, § 179, where the same rule is restated and amplified. See, also, *Spencer v. Houtt*, 29 Wn. (2d) 252, 186 P. (2d) 613.

■ It cannot be gainsaid that the "Earnest Money Receipt and Agreement" now before the court was a binding and enforcible contract. *Bloom v. Christensen*, 18 Wn. (2d)

137, 138 P. (2d) 655, and cases there cited. This is a much stronger case than *Bloom v. Christensen*, for, while the earnest-money agreement now before us is essentially the same as in that case, this was a cash sale and no other and more detailed contract was contemplated by the parties.

In suits by brokers for their commissions, it is held that the acceptance by the seller of the purchaser, by entering into a binding, enforcible agreement with him, precludes the seller from thereafter raising any question as to the qualifications and ability of the purchaser to perform. *McNamara v. Steckman*, 202 Cal. 569, 262 Pac. 297; *Isaac T. Cook Co. v. Craddock-Terry Co.*, 109 S. W. (2d) (Mo.) 731; 8 Am. Jur. 1095, Brokers, § 179. In any event, the Ritcheys could not with good grace raise that question here, as they not only accepted the Campbells as purchasers but concluded a sale to them upon the same terms as those in the agreement which Largent negotiated through his salesman, LaPoint. *Everson v. Phelps*, 104 Ore. 288, 206 Pac. 306, 26 A. L. R. 780.

We come now to the question of LaPoint's authority to cancel or rescind the commission agreement, by the terms of which Largent was entitled to either a five per cent commission on the purchase price, or five hundred dollars if the Campbells refused to complete the purchase and the Ritcheys elected to keep the earnest money as liquidated damages. There is no suggestion that the Ritcheys made such an election, and Largent is entitled to $781.25 or nothing.

There is no contention that LaPoint had actual authority to cancel the commission agreement; the question is: did he have apparent authority to do it?

[6] The authority of an agent is not apparent, in contemplation of law, merely because it looks so to the person with whom he deals. Some objective tests of what constitutes apparent authority are required. See 1 Mechem on Agency (2d ed.) 513, § 726, where, speaking of the apparent authority of an agent, it is said:

"It is only where a person of ordinary prudence, conversant with business usages and the nature of the particular

business, acting in good faith, and giving heed not only to opposing inferences but also to all restrictions which are brought to his notice, would reasonably rely, that a case is presented within the operation of the rule. If the inferences against the existence of the authority are just as reasonable as those in favor of it, there can be no reliance within this rule."

We made much the same statement in *Mohr v. Sun Life Assur. Co. of Canada*, 198 Wash. 602, 89 P. (2d) 504, when we said:

"The question is whether Smith, as manager of the Spokane office, had apparent authority to accept the assignment of Fry's earnings. The rule is that the principal is bound by the act of his agent when he has placed the agent in such position that persons of ordinary prudence, reasonably conversant with business usages and customs, are thereby led to believe and assume that the agent is possessed of certain authority, and to deal with him in reliance upon such assumption."

 Authority to buy or sell does not ordinarily include authority to rescind or modify the terms of the sale after its completion. See Restatement, Agency, 162, § 66. There is also an inference that an agent is to act for his principal's benefit and not to his detriment (Restatement, Agency, 98, § 39), and we find nothing in the facts and circumstances of this case that suggests that a person of ordinary prudence, reasonably conversant with business customs, could infer that LaPoint, the salesman, had authority to give away the commission to which Largent, the broker, was entitled.

Respondents cite only one case, *Exeter Co. v. Samuel Martin, Ltd.*, 5 Wn. (2d) 244, 105 P. (2d) 83, to support their contention that LaPoint did have such apparent authority. The question there was whether one Yates had authority to agree to the surrender of a lease. The following excerpt from that opinion states the issue and so clearly distinguishes the status of Yates from that of the salesman LaPoint that any further attempt at differentiation would be a work of supererogation:

"It is conceded that no express authority is shown. But respondents contend that there was sufficient evidence of

apparent authority to make the issue one for the jury. Appellant contends that a rental agent has no implied authority to make or cancel leases. This may be conceded. But Yates was much more than a mere rental agent of appellant. He was its secretary. As such, he executed the lease in question. He was in charge of the company's offices which were maintained in the building in which the demised premises were located. He negotiated for leases of appellant's properties. He was the only representative of the company who came in contact with its tenants. In short, he was manager in fact, if not in name, of the appellant's real estate holdings. We think, under the evidence, the jury was warranted in finding that Yates had apparent authority to enter into an agreement for the surrender of the lease."

We hold that, under the facts and circumstances here presented, a real-estate salesman whose efforts have earned a commission for the broker he represents has no apparent authority to cancel or rescind the commission agreement and thereby deprive the broker of a commission already earned. The trial court erred in making its conclusion of law

"That the act of J. H. LaPoint as agent for plaintiff [Largent] in writing 'Canceled' on defendants' [Ritcheys'] copy of the earnest money in issue constituted a release of defendants' liability thereunder."

The judgment of dismissal which logically followed such a conclusion of law will be set aside and a judgment in favor of appellant entered in the amount of $781.25, together with his costs.

SCHWELLENBACH, C. J., BEALS, DONWORTH, and FINLEY, JJ., concur.

---

August 14, 1951. Petition for rehearing denied.