422 P.2d 740

**O'MALLEY INVESTMENT AND REALTY COMPANY, an Arizona corporation, Appellant and Cross-Appellee,**

v.

**Lyle TRIMBLE and Margaret E. Trimble, husband and wife, Appellees and Cross-Appellants.***

No. 1 CA–CIV 295.

Court of Appeals of Arizona.

Jan. 27, 1967.

Rehearing Denied March 10, 1967.

Review Denied April 4, 1967.

* This appeal was filed with the Arizona Supreme Court and assigned that Court's No. 7659. The matter was referred to this Court pursuant to A.R.S. § 12–120.-23.

Kramer, Roche, Burch, Streich & Cracchiolo, by Frank Haze Burch and Charles L. Hardy, Phoenix, for appellant and cross-appellee.

Favour & Quail, by Keith F. Quail, Prescott, Harry A. Stewart, Jr., Phoenix, for appellees and cross-appellants.

KRUCKER, Judge.

This is an appeal from a judgment entered on a jury verdict in favor of the Trimbles for damages for breach of contract. In the trial court, appellees were plaintiffs and appellant was the defendant. (Although Phoenix Title and Trust Company was a defendant and counterclaimant and Valley National Bank of Phoenix was an additional counter-defendant, neither is a party to this appeal.) Appellees will hereinafter be referred to as the Trimbles, appellee Lyle Trimble will be referred to as Trimble and appellant will be referred to as O'Malley.

This litigation arose out of two agreements relating to the same property: (1) A Purchase and sale agreement with the Trimbles as seller and O'Malley as buyer; and (2) a lease of the subject property between O'Malley as lessor and Trimble as lessee. The Trimbles sought to recover the following:

1. Liquidated damages in the sum of $25,000.00 for an alleged breach of the realty purchase agreement;
2. Attorney's fees as provided by a promissory note executed by O'-Malley; and
3. Damages for an alleged breach of the lease agreement.

O'Malley admitted that the Trimbles were entitled to recover the $25,000.00 as liquidated damages because O'Malley had not fulfilled its obligations under the realty purchase contract and the Trimbles were awarded judgment in said amount. It contended, however, that its liability to the Trimbles was limited to the $25,000.00 for the reason that the lease agreement, as to which additional damages were sought, had never become effective. The sole issues submitted to the jury were whether O'Malley had breached the farm lease agreement and, if so, what damages, if any, were sustained by the Trimbles by virtue of said breach. The jury found in favor of the Trimbles on these issues and fixed their total damages in the sum of $71,424.61. In response to interrogatories, the jury stated that these damages consisted of $13,547.09 for removal of cattle, $32,877.52 for the construction of improvements, and $25,000.-00 for loss of profits.

After O'Malley filed motions for judgment in accordance with its motion for a directed verdict and for a new trial, the court set aside the award of $25,000.00 for loss of profits, but in all other respects denied the motions. Thereafter, an amended judgment was entered awarding the Trimbles, inter alia, $46,424.61[1] together with interest thereon, as damages for breach of the lease, O'Malley has appealed from this portion of the judgment and the Trimbles have filed a cross-appeal with regard to the denial of recovery for loss of profits.

The Trimbles were the owners of a property in Yavapai County known as Chino Valley Ranch. In the spring of 1959, they entered into negotiations with Mr. Witty and Mr. Sollenberger, salesmen for O'Malley, for the sale of the ranch property to O'Malley. On or about July 7, 1959, the Trimbles and O'Malley entered into a purchase agreement wherein the Trimbles agreed to sell and O'Malley agreed to buy the ranch property for the sum of $460,150.00.

The purchase agreement called for an earnest money deposit represented by a non-interest bearing note for $25,000.00, payable at the close of the escrow on or before November 7, 1959. The acknowledgment of receipt of the earnest money promissory note recited:

"Received from O'Malley Investment & Realty Co. or *Nominee* * * *." (Emphasis supplied)

---

1. The $25,000.00 award for loss of profits was subtracted from the total verdict of $71,424.61.

One provision of the contract provided:

"That if said Buyer shall fail to comply with any of the terms hereof, the Seller at his option may demand specific performance of this Contract, or may retain the amount paid herein as liquidated damages."

The portion of this provision following the word "option", that is, "may demand specific performance of this contract", was deleted.

Escrow instructions to Phoenix Title and Trust Company were subsequently prepared and executed by the parties. One part thereof recited:

"Earnest money deposit * * * shall be in the form of a promissory note * * *. Escrow Agent is directed to deliver said note to the Seller upon recordation of the Agreement for Sale.

* * * * * *

"O'Malley Investment & Realty Co. shall have the right to nominate another corporation as Buyer, and when such nomination is made, O'Malley Investment & Realty Co. shall have no further liability in connection with this escrow, except that O'Malley shall remain liable on the said $25,000.00 note.

*"Buyers and Sellers shall enter into a certain Agreement* dated August 11, 1959 called 'Share-Crop, Share-Livestock, Farm Operation and Lease Agreement' under the terms of which Sellers as Tenant shall lease all of the property herein and Buyer as Landlord shall let to Sellers all of the property sold herein for a period of three years beginning August 11, 1959. *A copy of said Agreement is attached hereto as Exhibit D.* Escrow Agent shall have no liability as to any of the contents thereof." (Emphasis supplied)

Another part thereof, relative to subsequent execution of an agreement for sale as evidence of part of the total purchase price recited:

"If Buyer is in default under such agreement, Sellers' remedy shall be limited to the enforcement of a forfeiture * * *."

and

" * * * Escrow Agent is authorized to deliver to Seller the documents and money deposited under these instructions or under such agreement." (Upon declaration of forfeiture)

A letter to the escrow agent, dated August 12, 1959, signed by both the vice president and general manager of O'Malley and the Trimbles, stated:

"Be advised that the undersigned Buyer and Sellers named in the above-numbered escrow have agreed that the Lease Agreement described in said escrow instructions as Exhibit D need not be attached to or considered a part of the escrow instructions."

At the time set for closing the realty purchase transaction, O'Malley was unable to perform, and after granting a 30-day extension of time for performance the Trimbles, on December 8, 1959, elected to cancel the escrow. The written notice of cancellation to the escrow agent stated:

" * * * if the Buyer has not complied with all the terms of said escrow instructions within thirteen (13) days from the date of receipt of this notice by the said Escrow Agent, said escrow shall thereupon become canceled.

"Upon cancellation, the sellers demand that the Escrow Agent deliver to the sellers the Promissory Note, dated July 7, 1959, in the amount of $25,000.00 deposited into the above mentioned escrow as earnest money."

In May 1960, the Trimbles sold the property, together with the improvements thereon, to another purchaser for the sum of $495,000.00. Subsequently this lawsuit was instituted by the Trimbles. This appeal is concerned solely with the portion of the judgment awarding the Trimbles damages for breach of the lease agreement by O'Malley and the portions thereof awarding $25,000.00 for breach of the purchase agreement and attorney's fees are not disputed.

The errors assigned by O'Malley are directed to the sufficiency of the evidence to support the verdict, the admission of parol evidence and hearsay testimony, and the trial court's instructions.

In order to ascertain the parties' intention, certain portions of the purchase agreement and the lease agreement are pertinent. The purchase contract recited the terms of the sale and, as we have previously indicated, provided that the seller might retain the earnest money deposit as liquidated damages if the buyer failed to comply with any of the terms of said agreement. In addition to the standard printed contract provisions, certain additional provisions were typed in. One such provision stated that the buyer and seller would enter into a lease agreement and outlined, generally, the planned lease agreement, including the leasehold term, the purpose of the lease, the sharing of expenses and income, the nature of the stock feeding operation, the parties' obligations as to equity capital, and the following specific provisions:

"2. * * * Lessee shall have the affirmative obligation to conduct a livestock feeding operation and hog feeding operation in accordance with the general plan now being used by Seller and in accordance with details to be hereafter worked out by Western Farm Management Company as representative of the Buyer * * *.

* * * * * *

"6. Lessor shall, *upon close of escrow*, make available as required the sum of $37,000 to be used for capital improvements on the premises to expand the facilities to accommodate the expanded livestock operation aforesaid. The contemplated improvements are set forth in Exhibit C attached hereto and by reference made a part hereof, which exhibit is entitled 'Proposed Capital Improvements.'" (Emphasis supplied) (The attached exhibit indicated a contemplated expenditure of $36,800.00.)

The lease agreement dated August 11, 1959, executed by Trimble as tenant and O'Malley as landlord, recited that the parties had entered into an agreement wherein the Trimbles were named as sellers and O'Malley or its nominee as buyer, for the purchase of the leasehold property by O'Malley. The general plan and intention was set forth:

"The parties hereto intend that Tenant shall operate and manage a farm and livestock feeding operation as a tenant on the property leased hereunder, and that the parties shall share certain costs and profits as hereinafter provided. *The lease herein provided shall take effect upon the close of the aforesaid escrow; however, Tenant's duties shall begin on and the division of profits and costs shall be computed from August 11, 1959.*" (Emphasis supplied)

Other provisions defined the tenant's duties respecting cultivation and care of the land crop-raising, pasturing stock, destruction of weeds, care of pigs and commission of waste. As to cattle, the lease provided:

"Tenant shall remove from the premises *on or before November 7, 1959*, all Tenant's cattle presently located thereon. * * *" (Emphasis supplied)

and

"Tenant shall use due diligence to acquire and have delivered to the premises on or before November 7, 1959, or as soon thereafter as reasonably possible sufficient feeder cattle weighing approximately 400 pounds each to fully use the feeding facilities on the premises."

One lease provision entitled "Financing" provided that until close of the escrow, the tenant would advance all equity capital required for the purchase of new cattle and would acquire same in his own name. Another provision entitled "Alterations and Improvements" stated:

"The parties intend that certain specific improvements shall be made and certain equipment shall be installed *as soon as reasonably possible* to accommodate the expanded livestock operation contem-

plated. These improvements are as follows: (Improvements and costs detailed)

\* \* \* \* \* \*

"The above-listed improvements and items of equipment shall be purchased and installed *only upon the mutual agreement of the parties. At close of escrow, Landlord shall make available such sums as may have been required* or shall thereafter be required to make the said improvements and to purchase the said equipment, not to exceed the sum of Thirty-seven thousand Dollars ($37,-000.00) which shall be paid out only upon the mutual approval of Landlord and Tenant. Additional improvements and alterations shall be made and additional permanent equipment shall be installed upon the premises only with the written consent of Landlord." (Emphasis supplied)

Paragraph 37 of the lease agreement recited:

"Landlord has retained as its manager Western Farm Management Company, \* \* \* which is authorized to deal with Tenant on behalf of Landlord in accordance with the management contract marked Exhibit No. 4 attached hereto and by reference made a part hereof. Tenant shall have the right to deal with Western Farm Management Company as Landlord's manager until receipt of notice from Landlord stating that Western Farm's authority has terminated."

Paragraph 38 of the lease agreement entitled "Effective Date" recited:

"Tenant's duties hereunder shall commence as of August 11, 1959. *Landlord's duties hereunder shall commence upon close of the aforesaid escrow*; provided, however, that upon commencement of Landlord's duties, its obligations to share in costs shall be computed as of August 11, 1959." (Emphasis supplied)

Paragraph 22 of the lease agreement entitled "Maintenance of Improvements" provided:

"Tenant shall bear the risk of loss or damage to the improvements until and in-cluding the date of close of said escrow. Thereafter, Landlord shall bear the risk of loss or damage."

Paragraph 36 of the lease agreement contained the following:

"It is understood that O'Malley Investment & Realty Co. intends to cause a corporation to be formed to be named Chino Valley Farms, Inc., which when duly organized will be named as Landlord hereunder. From and after the date that notice of such nomination is delivered or mailed to Tenant, such new corporation shall have all of the duties and obligations of Landlord and O'Malley Investment & Realty Co. shall be relieved from any further liability hereunder."

The farm management contract, dated August 11, 1959, between O'Malley and Western Farm Management Company, provided in part:

"Owner (O'Malley) hereby employs Manager (Western Management Co.) and Manager hereby agrees to serve as Manager on behalf of owner of the aforesaid property and to represent Owner in its dealings with the said Lyle E. Trimble *under the said Lease*. The Manager's duties shall commence as of August 11, 1959.

\* \* \* \* \* \*

"Manager shall represent Owner in dealing with the Tenant *under the Trimble Lease* and, in this capacity, Manager shall have full authority on Owner's behalf to approve cropping programs, and the acquisition and sale of livestock, feed, and supplies.

\* \* \* \* \* \*

"In addition to those things specifically above set forth, Manager shall do all things necessary and proper to realize good and proper management and operation of the property for the best interests of Owner.

\* \* \* \* \* \*

"This Agreement shall be terminated upon cancellation of said escrow or forfeiture of Buyer's rights thereunder \* \* \*.

\* . \* \*. \* . \* \*

"O'Malley Investment & Realty Co. intends to organize a corporation to be known as 'Chino Valley Farms, Inc.,' which shall be nominated as and shall become the Buyer in the aforesaid purchase transaction and Owner hereunder." (Emphasis supplied)

The aforesaid documents were prepared by Jarrett Jarvis, attorney for O'Malley and its "director of investments." Mr. Bryce Miller of Western Farm Management Company assumed the management duties set forth in the management contract and most of Trimble's dealings relative to the lease operation were with the said Miller. Although all the contracts were executed by the duly authorized officers of O'Malley, Trimble had no direct dealings with them. All negotiations and conferences pertaining to the contract and lease terms were with Witty and Sollenberger, salesmen for O'Malley, and Jarvis and Miller.

Everyone, including Trimble, fully understood that O'Malley did not contemplate the purchase and lease-back arrangement for itself. Its plan, as substantiated by the references to a "nominee" in all of the written agreements, was to interest potential investors in forming a syndicate to buy and operate the property with the hopes of procuring a substantial return on their investment. To promote the scheme, the parties entered into the lease arrangement, thereby making the whole plan more attractive to potential investors.

It is well established that a contract must be construed as a whole and the intentions of the parties thereto must be collected from the entire instrument and not from detached portions. Employer's Liability Assurance Corp. v. Lunt, 82 Ariz. 320, 326, 313 P.2d 393 (1957); Hamberlin v. Townsend, 76 Ariz. 191, 196, 261 P.2d 1003 (1953). When construed in this fashion, it is clear that the liability of O'Malley was limited to $25,000.00 and it had no obligation under the lease agreement until the close of the escrow. Indeed, Trimble did

not deny that such was the intent of the parties when the purchase agreement was executed. He testified:

"Q Now at the time, or immediately before the time you signed the purchase contract, purchase and sale contract, Exhibit 1, were you informed by anyone or by Bill Moeur in the discussion that the total amount of the exposure liability of O'Malley Investment and Realty Company was $25,000?

"A Yes, just prior to the signing of this exhibit that was discussed.

"Q And Mr. Moeur advised you or agreed with that fact, did he not?

\* \* \* \* \* \*

"Q Did he advise you that that was the effect of your agreement?

"A Yes."

As indicated above, one paragraph of the lease provided for its effective date to be the close of the escrow. The paragraph dealing with alterations and improvements provided that O'Malley would make available *at the close of escrow,* such sums "as *may have been required* or shall thereafter be required" to make said improvements. This paragraph further recited the intention of the parties that certain improvements be made and certain equipment installed *as soon as reasonably possible* to accommodate the contemplated expanded operation. The lease further provided that on or before November 7, 1959, Trimble was to remove his own cattle from the lease premises and use due diligence to acquire and have delivered to said premises new cattle which were to be purchased in his name only.

Although the lease clearly delineated that the obligations of O'Malley thereunder were to commence upon the close of the aforesaid escrow, the duties and obligations of Trimble were to commence immediately on August 11, 1959. A condition precedent to the obligation of O'Malley to perform under the terms of the lease was the close of the escrow. Such condition is a fact which

must exist or occur before a duty of immediate performance of a promise arises. Yeazell v. Copins, 98 Ariz. 109, 114, 402 P.2d 541 (1965); Restatement of the Law of Contracts § 250(a).

■ O'Malley contends that the purchase contract and lease are indivisible, while Trimble takes the contrary view treating the two as separate agreements. Whether a contract is entire or severable is a question of the intention of the parties, to be ascertained from the language employed and the subject matter of the contract. Leeker v. Marcotte, 41 Ariz. 118, 128, 15 P.2d 969 (1932). As stated in Waddell v. White, 51 Ariz. 526, 541, 78 P.2d 490 (1938):

"A contract may both in its nature and and by its terms be severable, and yet rendered entire by the intention of the parties. We think that perhaps the best test is whether all of the things, as a whole, are of the essence of the contract. That is, if it appeared that the purpose was to take the whole or none, then the contract would be entire; otherwise, it would be severable. (Citation)"

■ Applying these principles to the O'Malley-Trimble transaction, we believe that the parties intended that the lease arrangement be dependent upon consummation of the sale of the ranch property. It is inconceivable that the parties would contemplate performance of the farm lease agreement if the sale fell through. When all of the documents pertinent to the transaction are reviewed, a common denominator is revealed—"the close of the escrow". The only construction of which the transaction is susceptible is that Trimble was to commence performance of certain duties and obligations to "get ready" for the planned venture. If the sale materialized, the lease

thereupon became binding upon O'Malley, retroactive to August 11, 1959 as to division of costs and profits.

Trimble contends, however, that if the purchase contract and lease agreement were not initially separate obligations, the parties subsequently modified their agreement so as to render the lease, and the obligations of O'Malley thereunder, immediately effective and binding upon O'Malley. O'Malley argues that if there was such modification, it was not in writing and, therefore, violative of the Statute of Frauds;[2] further, that parol evidence was inadmissible to vary or amend the terms of the written agreement of the parties, which was unambiguous.

■ We agree that there was no ambiguity to justify the admission of parol evidence, but parol testimony may be admitted to show that the contracting parties subsequently changed, altered or modified their previous agreement. In re Estate of MacDonald, 4 Ariz.App. 94, 417 P.2d 728, 731 (1966). As stated in Simpson on Contracts § 63:

"The parol evidence rule has never prevented proof of an oral or written agreement which varies or contradicts the terms of a prior written contract. If it did, it would be a wholly unwarranted interference with freedom of contract. Parties may change, add to, and totally control what they did in the past. They are wholly unable by any contractual action in the present, to limit or control what they may wish to do contractually in the future."

See also American Eagle Fire Ins. Co. of New York v. McKinnon, 36 Ariz. 409, 414, 286 P. 183 (1930); Sitkin v. Smith, 35 Ariz. 226, 230, 276 P. 521, 66 A.L.R. 645 (1929); 17A C.J.S. Contracts § 377a.

2. A.R.S. § 44–101:
"No action shall be brought in any court in the following cases unless the promise or agreement upon which the action is brought, or some memorandum thereof, is in writing and signed by the party to be charged, or by some person by him thereunto lawfully authorized:
*　*　*　*　*
"6. Upon an agreement for leasing for a longer period than one year *　*　*."

18

If Trimble's contention that the subsequent events pertain to another agreement between the parties is correct, this would be a new contract which would have to be in writing. Kammert Bros. Enterprises, Inc. v. Tanque Verde Plaza Co., 4 Ariz.App. 349, 420 P.2d 592, 306 (1966); Yrisarri v. Wallis, 76 N.M. 776, 418 P.2d 852, 855 (1966); A.R.S. § 44-101(6).

The Trimbles argue that O'Malley failed to plead the affirmative defense of the Statute of Frauds and thereby waived it. Mallamo v. Hartman, 70 Ariz. 294, 297, 219 P.2d 1039, rehearing 70 Ariz. 420, 421, 222 P.2d 797 (1950). The record discloses, however, that O'Malley was permitted to amend its answer, after trial, to assert the defense of the Statute of Frauds. The question of the oral modification of the lease agreement was tried without objection by the Trimbles. In fact, their objection to the court's refusal to give their requested instruction on the manner in which modification of a written agreement could be effected expressly admits the existence of such issue. The trial court instructed the jury on the Statute of Frauds without objection by the Trimbles. On this state of the record, the amendment to the answer of O'Malley was properly granted after trial. Arizona Rules of Civil Procedure, Rule 15 (b), 16 A.R.S.; Spellman Lumber Co. v. Hall Lumber Co., 73 Ariz. 322, 325, 241 P.2d 196 (1952). This court is, therefore, not precluded from considering the issue on appeal.

The Trimbles further maintain that if the Statute of Frauds is applicable, it is no bar to the enforceability of an oral modification of the lease agreement because of their full performance of the modified agreement. It is well settled in this jurisdiction that a party may be estopped to assert the defense of the Statute of Frauds when he has induced or permitted another to change his position to his detriment in reliance upon an oral agreement within its operation. See Kammert Bros. Enterprises, Inc. v. Tanque Verde Plaza Co., supra; Custis v. Valley National Bank of Phoenix,

92 Ariz. 202, 375 P.2d 558 (1962); Waugh v. Lennard, 69 Ariz. 214, 211 P.2d 806 (1949); Cress v. Switzer, 61 Ariz. 405, 150 P.2d 86 (1944); Diamond v. Jacquith, 14 Ariz. 119, 125 P. 712, L.R.A.1916D, 880 (1912). We agree that the doctrine of equitable estoppel would be available to the Trimbles to preclude assertion of the Statute if they acted *solely* in reliance upon a subsequent oral agreement or oral modification of the lease agreement.

The pivotal question is whether the Trimbles proved a modification of the lease agreement, the burden of which rested with them. See Yeazell v. Copins, supra. While mutual assent of the parties to a modification of their agreement is essential, such assent need not be express but may be implied from a course of conduct in accordance with its existence. Alexander v. O'Neil, 77 Ariz. 91, 98, 267 P.2d 730 (1954); 17A C.J.S. Contracts § 375.

In its relations with the public, a corporate entity such as O'Malley can act only through its duly authorized officers and agents. Lois Grunow Memorial Clinic v. Davis, 49 Ariz. 277, 284, 66 P.2d 238 (1937); 19 C.J.S. Corporations § 999. The Trimbles claim that all of their dealings and negotiations with O'Malley were conducted through its agents, Witty, Sollenberger, Jarvis and Miller. O'Malley claims that a modification of its agreement, if any, could not be executed by these agents since only the investment committee could approve such contracts. Further, that since all the formal documents were executed on behalf of O'Malley by officers of the corporation, the Trimbles were put on notice that only duly authorized officers could alter or modify them.

As a general rule, one dealing with an agent is bound to ascertain the extent of an agent's authority. Lois Grunow Memorial Clinic v. Davis, supra; Litchfield v. Green, 43 Ariz. 509, 512, 33 P.2d 290 (1934). A corporation, however, may be bound where its agent acts without or in excess of his actual authority if he acts

within the scope of an apparent authority with which the corporation has clothed him. Pacific Guano Company v. Ellis, 83 Ariz. 12, 16, 315 P.2d 866 (1957); 19 C.J.S. Corporations § 996.

It behooves us to evaluate the events and occurrences upon which the Trimbles predicate their claim that the lease agreement had been modified so as to render it binding upon O'Malley even though the escrow did not close.

The following letter dated August 12, 1959, addressed to Mr. Trimble, is also in evidence:

"Dear Mr. Trimble:

Re: *Sale of Chino Valley Ranch*

"We have this date delivered to the Midtown Office of Phoenix Title and Trust Company an executed copy of the escrow instructions (No. 702884) concerning the sale of your Chino Valley Ranch to O'Malley Investment & Realty Co., together with the $25,000 earnest money note. I have delayed delivering the instructions and note for the reason that the escrow instructions recite that the Lease Agreement is an exhibit to the instructions. The Lease Agreement has four exhibits which are not yet prepared. I intended to delay turning over the escrow instructions to Phoenix Title until all of the exhibits to the Lease Agreement were prepared and attached.

"It has occurred to me that, because the Lease Agreement has now been signed, there is no need to have it as an exhibit to the escrow instructions. Therefore, I have delivered the instructions to the Title Company without the Lease attached. Probably the Title Company will require some kind of letter to them explaining the reason why the Lease has not been attached to the instructions. Therefore, I have prepared and enclose herewith for your execution a letter to the Title Company stating that it need not be concerned with the Lease. If you are in harmony with this suggestion would you sign two copies of the letter, send one to the Title Company and return one to us.

Very truly yours,
O'Malley Investment and
Realty Company.

JARRETT S. JARVIS
Jarrett S. Jarvis
Director of Investments"

Much emphasis is placed upon the letter of August 12 to the escrow agent, (to which we have referred earlier in this opinion), informing it that the lease was not to be attached to or considered part of the escrow instructions. Trimble's interpretation of the letter, according to his testimony, was that O'Malley "had bought a ranch." The escrow instructions, however, do not purport to make the lease a part of the escrow but merely recite that the parties would enter into a lease agreement dated August 11, 1959, a copy of which was "attached" thereto as an exhibit. The letter of August 12, from Jarvis to Trimble, suggesting that the letter to the title company be sent regarding the absence of the lease agreement as an exhibit, fully explains the import of the latter communication. Both letters were admitted into evidence by stipulation of the parties and, therefore, there is no dispute concerning them. Trimble did not deny receipt of the letter from Jarvis. Jarvis testified as follows concerning the letter he wrote to Trimble:

"Q How does it happen you wrote the letter to Trimble and prepared the letter for the Phoenix Title and Trust which are Exhibits 4 and 5 just referred to?

"A After Mr. and Mrs. Trimble had been into my office on the 7th of August and had signed the escrow instructions and the lease agreement I kept in my office the signed copies of the escrow instructions that we intended to send over to Phoenix Title, and as you pointed out, one of the provisions of the escrow instructions is that a copy of the form of the lease was to be attached to the

escrow instructions, but it became clear to me that after the lease had been signed and was delivered, no purpose would be served by having it attached to the escrow instructions, so I wrote a letter to Mr. Trimble saying, 'There is no need to send it.' And that is what I did.

"Q And have you had any conversation with Mr. Trimble, Bill Moeur or anyone representing Mr. Trimble before you took that action and wrote Exhibit 4 to him?

"A You mean conversations about this matter?

"Q About this matter, yes.

"A None."

Trimble, however, testified at the trial that the letter of August 12, 1959 to the escrow agent was executed "taking this lease out of escrow and we proceeded on that basis to take it out of escrow instead of writing a new lease." Whether the lease was or was not a part of the escrow could not alter the obligations of the parties which were clearly defined in their formal written agreement. By signing the lease, Trimble obligated himself to immediate performance. If he believed, as he testified, that he could not operate under a lease "tied into escrow", he misconstrued the lease provisions. *His* obligations under the lease were not conditioned upon the close of the escrow.

Trimble argues that the execution of the letter of August 12, 1959, coupled with the conduct of the agents of O'Malley, "causing" him to proceed under the terms of the lease agreement, are referable to a modification of the lease in that O'Malley was thereby obligated to perform. We cannot agree. The acts performed by Trimble were in accordance with the obligations he had assumed. He had agreed to remove his own cattle on or before November 7, 1959. He had agreed that certain improvements would be installed as soon as reasonably possible in accordance with the mutual approval of the parties. When he expressed his concern about proceeding with the im-

provements program and requested written authorization from Mr. Miller, the following letter was sent to him by Miller:

"August 21, 1959

"Mr. Lyle E. Trimble
641 W. Main
Mesa, Arizona

Dear Mr. Trimble:

As Managers of the Chino Valley Farms, Inc., we hereby authorize you to go ahead with the improvement of the property as listed in the recent Sales Agreement whereby you were the Seller and O'Malley Investment & Realty Co. of Phoenix, Arizona, was the Buyer.

For the most part, these improvements consist of running a natural gas line to the headquarters; purchasing and installing a boiler and barley roller; purchasing and installing a grain elevator; purchasing and installing a feed mill and blender; enlarging the present ensilage storage; and completing the south side of the cattle feed pens.

We would like to have these jobs started as quickly as possible so they will be completed in time to install the maximum operating program on the property just as soon as possible.

Very truly yours,

Western Farm Management Company

By      F. BRYCE MILLER
        F. Bryce Miller"

■ This letter of authorization from Miller cannot be construed as evidence of modification. The letter is in accord with the provisions of the lease itself, which provided that both O'Malley and Trimble were required to approve expenditures for capital improvements. Miller, in executing the letter, was acting for O'Malley in accordance with the express authority conferred upon him, i. e., to act for O'Malley "under the lease". Some fanciful legerdemain would be required to distort the letter into a binding agreement to pay for the improvements. Additionally, this letter did not motivate Trimble to remove his cattle, as he

admitted at trial that he had started removing his cattle prior to receipt of the letter.

■ The purchase agreement, the lease agreement, and the management contract clearly defined the extent of the authority of Western Farm Management, i. e., to act as the representative of O'Malley to conduct the planned operation and work out the details thereof, to deal with Trimble in accordance with the management contract, and to represent O'Malley in dealing with Trimble *under the lease*. We find neither actual nor apparent authority to modify the lease agreement with regard to the obligation of O'Malley to perform, notwithstanding Miller, as an employee of Western Farm Management, was endowed with broad powers to deal with Trimble concerning the contemplated program, subject of the lease. See Restatement of Agency 2d § 73.

■ As to Witty and Sollenberger, there is no evidence from which can be inferred authority to modify the lease for O'-Malley. The scope of their authority was limited to negotiating realty transactions for the investment corporation, that is, "putting deals together". A mere salesman does not have authority to alter or modify a contract on the principal's behalf. Dubinsky v. Lindburg Cadillac Co., 250 S.W.2d 830 (Mo.App.1952); Largent v. Ritchey, 38 Wash.2d 856, 233 P.2d 1019, 1022 (1951); Restatment of Agency 2d § 66.

Assuming arguendo that the agents of O'Malley had authority to modify the lease so as to bind O'Malley prior to the close of the escrow, we find nothing in the record to indicate an altered agreement. Trimble testified as to a November 7, 1959 meeting with Jarvis, Witty and Miller:

"A The conversation there at that time was that Carl Pearce who was, I believe, the manager, general manager or president of O'Malley Investment, was out of town and would be out of town for a couple of weeks. They needed to get his okay on these bills,[3] but they would be paid then just as soon as he came in. They wanted to go ahead and work on this, and I granted them the 30-day extension to go ahead at that time.

"Q Did you actually bring in some bills at that particular time and leave them with Mr. Witty and Mr. Jarvis?

"A Yes.

Mr. Trimble also testified to an October 15, 1959 meeting with Jarvis and Witty, at which time he discussed payment of these bills. He stated that he told them "these people wanted some money", to which Jarvis and Witty said:

"If you will just give us ten days or two weeks here to get our people lined up, that we want to put in this syndicate, we will have this thing all together and then we can take care of these people. And I know if you explain that to them that they will understand that as soon as we get this put together here, which will take us from ten days to two weeks, we can take care of these people."

Trimble testified that after this conversation he contacted one creditor and Miller contacted the other. He further testified about a meeting in Miller's office, with himself, Witty, Jarvis and Miller being present, prior to the execution of the letter of August 12, 1959 to the escrow agent:

"Q Did you have a discussion at that time? Answer it yes or no.

"A Yes.

"Q In connection with this lease and its terms insofar as the escrow was concerned?

"A Yes.

"Q Would you relate again, Mr. Trimble, as well as you can what each of the parties said including yourself at this conversation?

"MR. HARDY: Same objection heretofore made, if the Court please.

"THE COURT: Objection overruled. You may proceed.

3. These bills were for capital improvements which had been installed.

"THE WITNESS: I started out and told all present I couldn't carry on under the terms of this lease with it tied into this escrow. Bryce Miller sustained this and said he was sure that it wasn't going to work, and it was discussed among all present that maybe we should rewrite this lease, and then it was agreed that it would probably be the easiest way to do this would be to take this lease out of the escrow with a letter, and it was agreed among us that that is what they would do.

"I said, 'Let's remember one thing. If you take this lease out of escrow it would please me very much, because I wouldn't hesitate going ahead with these improvements, because I know that if you take this lease out of escrow you people have bought a ranch.'

"Jim Witty said, 'We know we are going to buy this ranch. If we don't get it syndicated we will buy the ranch ourselves. Isn't that true, Jarvis?'

"And Jarrett said, 'Yes, that is right.'

"Witty further said, 'This is too good a deal for us to let go by.'

"I said, 'On that basis, don't let's rewrite the lease, then. Let's take it out of escrow, but let's do it legally.'

"Therefore, Jarrett Jarvis prepared a document or a piece of paper for Mrs. Trimble and I to sign, taking this lease out of escrow and we proceeded on that basis to take it out of escrow instead of writing a new lease.

"Q Let me call your attention to the share-crop, share-livestock agreement which I call a lease, and calling your attention in particular to the provisions of that did you discuss specifically at that time the provisions of this lease that refer to the escrow?

"A All the provisions of this lease that referred to the escrow were discussed, and it was agreed that due to the fact that it tied into the escrow that we were going to get it out of the escrow or there was no other way to operate under this lease.

"O'Malley Investment representatives said, 'We have no objection to taking this lease out of the escrow, because we know we are going to buy the place.'

"I said, 'Fine and dandy. Let's do it legally.' And that is when we wrote a letter. I am sure we have got it here, taking this lease out of the escrow.

"Q When you say, 'this lease,' that is Exhibit No. 3?

"A Yes, this is the sharecrop lease.

"Q Now, subsequently, did you receive the letter that you previously identified from Mr. Jarvis and actually executed an instruction to the title company which was previously marked as Exhibit No. 5, is that correct?

"A Yes, this is the letter that we received.

"Q And you mailed that then or delivered it to the title company?

"A Yes.

"Q Or a copy of it?

"A A copy of it. This is our copy that we kept in our files, I am sure."

When asked on direct examination why he moved his cattle prior to November 7, Trimble responded:

"A Mr. Miller asked me to get the cattle out of the pen so we could get started on the construction of the additional new pens, and I told him I would get them out as fast as I could, and I did. I promised to have them out by September 1st."

Mr. Moeur, Trimble's "financial adviser", testified in substance that Miller agreed with him and Trimble that nothing could be done under the lease until the lease and the escrow were severed completely and a separate agreement and mutual understanding of the parties was arrived at as to how it was to be proceeded upon. Assuming that such nebulous statements as to "taking the lease out of escrow" were in fact made, we cannot equate them to an agreement to

modify or alter the terms thereof. Moeur further testified:

"Q On Mr. Trimble's behalf you didn't ever request to see this Farm Management Contract?

"A We discussed it with Mr. Miller and relied on what he said his authority would be. We dealt with him.

"Q Relying on what Mr. Miller told you?

"A We had no reason to question him and his authority from O'Malley.

"Q You made no investigation to determine what authority Mr. Witty had?

"A Let me go back and tell you whenever we talked to Mr. Jarvis or Mr. Witty they both emphatically told us, 'Western Farm Management is going to be represented by Bryce Miller; they are our representatives; whatever they tell you, whatever they do is what we want done. You will deal with him entirely. *You won't deal with us from this time on, because when you get into the operation and installation of these improvements that is their responsibility and not ours. That is the reason we pay them and hire them and retain them.*'" (Emphasis supplied)

And:

"Q You did not investigate the authority of Mr. Witty?

"A We questioned him as to his authority.

"Q You questioned him also?

"A And he said he had full authority to represent O'Malley Investment Company.

"Q And you did not investigate to determine what Jarvis' authority was?

"A No. We didn't investigate his authority. We took their word for it."

■ Viewing this testimony most favorably to Trimble's position, we cannot accept the construction he placed on these conversations and actions which accord with the provisions of the written agreements of the parties. We, therefore, conclude that Trimble failed to sustain his burden of proving a modification of the written lease agreement.

Since the obligations of O'Malley to perform were conditioned upon the occurrence of an event which did not come to pass, namely, the close of the escrow,[4] there was no breach of contract on its part and the trial court should have granted the motion by O'Malley for judgment in accordance with its motion for a directed verdict.

The cross-appeal by the Trimbles becomes moot in view of our reversal of the subject portion of the judgment.

For the reasons herein expressed, the judgment below is reversed as to the award of damages to the Trimbles for breach of the lease agreement and the lower court is directed to enter judgment in favor of O'Malley on the Trimbles' third cause of action.

HATHAWAY, C. J., and MOLLOY, J., concur.

NOTE: This cause was decided by the Judges of Division Two, as authorized by A.R.S. Section 12–120, subd. E.

4. See Goodman v. Newzona Investment Co., 101 Ariz. 470, 421 P.2d 318 (filed December 7, 1966).