## '' IDA HOUSTON '', Petitioner, *v.* '' JAMES HOUSTON '', Respondent.*

Domestic Relations Court of the City of New York, Famny Court, Queens County, July 7, 1950.

---

* The opinion as filed sets forth the true names of all parties but as here published substitutes fictitious names and disguises certain other details, in consonance with the spirit of section 52 of the Domestic Relations Court Act of the City of New York (L. 1933, ch. 482).

*Sol H. Cohn* for petitioner.

*Courtenay L. Wiltshire* for respondent.

SICHER, J. The parties duly intermarried on September 28, 1940, and that relationship has never been terminated by judgment of divorce, separation, annulment or dissolution. However, respondent asserts complete exoneration from any present duty of support, on the ground that because of claimed sterility he is not the father of petitioner's child born June 3, 1949. Such disclaimer carries with it an imputation of petitioner's adultery, which, if established, would limit respondent's support obligation to the minimal duty of indemnifying the community against the burden of petitioner's maintenance (*Lifshitz* v. *Lifshitz,* 249 App. Div. 859); and at this time petitioner is not a '' public charge '' nor likely to become one.

In this proceeding the Family Court has jurisdiction, and the duty, to determine legitimacy (*Baxter* v. *Baxter,* 250 App. Div. 502; cf. *Matter of Lentz,* 247 App. Div. 31). Such determination, however, would be solely for purposes of this court's support orders (*Matter of Melis* v. *Department of Health of City of N. Y.,* 260 App. Div. 772), and would not be *res judicata* in any other court (see *Loomis* v. *Loomis,* 288 N. Y. 222). The child would be bound only by an adjudication of legitimacy in a Supreme Court plenary action to which he is a party or by appropriate steps for the disposition of that issue upon the trial of a divorce action (see '' *Primavera* '' v. '' *Primavera* '', 195 Misc. 942, especially authorities collated pp. 946–947).

The instant case has been unusually well prepared and presented by zealous counsel, who have aided the court in a difficult situation by the competence and fairness of their trial tactics and scholarly briefs.

Stipulations and concessions have narrowed the original issues to one of paternity; the sole still disputed question for determination is whether the evidence adduced by respondent suffices to overcome the time-honored presumption that a child born to a married woman during coverture was procreated by her husband.

There is no contention of nonaccess; the parties lived under the same roof and occupied one bed until more than a month after the August 25, 1949, filing of the support petition; the blood-grouping tests which respondent requested did not estab-

lish definite exclusion; there was no identification of a paramour nor proof of any inclination of petitioner to infidelity. Respondent's seemingly sincere belief that he is not the father of the child and his consequent resistance to any order of support derive wholly from certain medical testimony. A clinical laboratory technician (not a physician) testified that his June 7, 1948, and October 20, 1948, examinations of purported specimens of respondent's seminal fluid showed complete absence of spermatozoa. A qualified urologist also testified that his microscopic examination of respondent's seminal fluid at that urologist's office on November 24, 1948, and a second examination after sedimentation and centrifugal processing, disclosed azoospermia, which he attributed to a blocking of the epididymis ducts from prostatitis or a previous infection. He further testified that the scar tissue he observed indicated, in his opinion that the November 24, 1948, absence of spermatozoa had existed at least for thirty days and perhaps sixty days. However, both he and another urologist called to the stand by respondent admitted that it was medically possible that the sterility condition observed on November 24, 1948, might not have existed already at the date of the impregnation of petitioner in August or September, 1948, although each of them deemed it unlikely that the inception of the sterility condition was more recent.

Decision has been long deferred, initially during the now collapsed negotiations for an over-all adjustment of the entire marital conflict and thereafter to await the outcome of the appeal in *Commissioner of Welfare* v. *Costonie* (277 App. Div. 90 [June 13, 1950]).

That appeal raised squarely the question whether " competently performed blood-grouping tests excluding paternity " are mere opinion evidence or whether " it is a scientifically established and accepted fact that an exclusory finding is conclusive as to nonpaternity " and that " in such case the courts should accept the decisiveness of a nonpaternity finding properly arrived at as it would accept the demonstrable fact that a mixture of blue and yellow colors will produce varying shades of green, but never a red color ". (*Per Curiam* opinion, *Commissioner of Welfare* v. *Costonie*, 277 App. Div. 90, 91.)

In its *Per Curiam* reversal of the Court of Special Sessions the Appellate Division, First Department, unanimously adopted the view of the highest court of the State of Maine (*Jordan* v. *Mace*, 69 A. 2d 670) that " biological laws were not to be ignored and that where exclusion of paternity was definitely established

by blood-grouping tests, the finding of nonpaternity was binding upon the jury unless it found that the tests had not been properly made." (*Per Curiam* opinion, 277 App. Div. 90, 91.) And in a concurring opinion Mr. Justice Shientag wrote : " The Legislature has not thus far seen fit to make conclusive the blood grouping test where definite exclusion of paternity is established. Despite that, however, the courts may not ignore the universal scientific opinion that such tests, resulting in exclusion, are, in fact, conclusive on the issue of paternity. These tests, while they cannot indicate affirmatively that the defendant in a filiation proceeding is the father of the child, do, in certain cases, exclude the possibility of the defendant being the father. Such scientific exclusion should, assuming the tests to have been competently and accurately made, be accepted as conclusive by the trial court, notwithstanding the strength, as in this case, of the nonscientific testimony to the contrary. There should be no occasion for expert testimony in every case to prove the scientific validity of blood-grouping tests resulting in exclusion of paternity. The scientific opinion on that point is so general that courts may take judicial notice of it in filiation proceedings." (*Commissioner of Welfare* v. *Costonie,* 277 App. Div. 90, 92.)

That enlightened judicial acceptance of the decisiveness of properly administered blood-grouping tests supersedes the narrower view elaborated in *Harding* v. *Harding* (22 N. Y. S. 2d 810, affd. 261 App Div. 924). Incidentally, since the *Harding* v. *Harding* affirmance was without opinion, the Appellate Division, Second Department, did not adopt the reasoning of the court below (see *Rogers* v. *Decker,* 131 N. Y. 490; 10 Abbott's N. Y. Digest, Courts, § 90 [1]); indeed, a sufficient ground for refusal in *Harding* v. *Harding* to recognize the blood-grouping tests report would have been that in October, 1940, there was no provision therefor in a Family Court proceeding. The Domestic Relations Court of the City of New York is a statutory court of enumerated powers; and the authorization for blood-grouping tests in its Family Court Division was first enacted by section 1 of chapter 761 of the Laws of 1942. That is, the critical analysis of section 306-a of the Civil Practice Act in the *Harding* v. *Harding* opinion was quite aside the mark; the Civil Practice Act applies to the practice only in courts of record (Civ. Prac. Act, § 1), and the Domestic Relations Court of the City of New York is not a court of record (Judiciary Law, § 2). See " *Denton* " v. " *Denton* " (179 Misc. 681, 685).

Another recent example of judicial acceptance of the decisiveness of blood-grouping nonpaternity tests is *Cuneo* v. *Cuneo* (198 Misc. 240) in which plaintiff was granted an annulment largely upon the testimony of Dr. Unger and Dr. Weiner that the blood-grouping tests made by them showed that " the child in question could not possibly be the child of the plaintiff. To reject such testimony would be tantamount to rejecting scientific fact. Courts should apply the results of science, when competently obtained, in aid of situations presented. To reject such results is to deny progress." (*Cuneo* v. *Cuneo, supra,* p. 245, [Gavagan, J.].)

Accordingly, if the blood-grouping tests report in the case at bar had established definite exclusion (as it did not) and if, also, those tests had been shown to have been accurately and competently made within the requirements of *Commissioner of Welfare* v. *Costonie* (*supra*) such blood-grouping tests evidence would have served to overcome the presumption of legitimacy of a child born to a married woman under the relaxed modern rule of *Matter of Findlay* (253 N. Y. 1) : " Potent, indeed, the presumption is, one of the strongest and most persuasive known to the law (*Hynes* v. *McDermott,* 91 N. Y. 451, 459; *Matter of Matthews,* 153 N. Y. 443), and *yet subject to the sway of reason.* Time was, the books tell us, when its rank was even higher. * * * Since then the presumption of legitimacy, like other presumptions, such as those of regularity and innocence, has been subject to be rebutted, though there have been varying statements of the cogency of the evidence sufficient to repel it. * * * A formula so inexorable has yielded with the years to one more natural and supple. * * * By and large, none the less, *the courts are generally agreed that countervailing evidence may shatter the presumption* though the possibility of access is not susceptible of exclusion to the point of utter demonstration. *Issue will not be bastardized as the outcome of a choice between nicely balanced probabilities.* * * * *They will not be held legitimate by a sacrifice of probabilities in a futile quest for certainty.* * * * What is meant by these pronouncements, however differently phrased, is this and nothing more, that *the presumption will not fail unless common sense and reason are outraged by a holding that it abides.* * * * *The presumption does not consecrate as truth the extravagantly improbable,* which may be one for ends juridical, with the indubitably false." (*Matter of Findlay, supra,* pp. 7–8; emphasis supplied.)

However, in the case at bar not only was the blood-grouping tests report inadmissible because it did not establish definite exclusion but also quite different considerations govern a plea of sterility*. Blood-grouping non-paternity tests techniques have now been developed to the point of scientific certainty. Not so the field of sterility, which is still in a nascent stage and fraught with uncertainties. Therefore, in addition to doubts as to the quality of the June 7th and October 20, 1948, laboratory examinations of purported specimens of respondent's seminal fluid, the omission of testicular biopsy during the November 1948 urological examinations, and the complete dearth of identification of any paramour or of evidence of any inclination of petitioner to infidelity, the medical testimony of respondent's sterility at other times was inadequate to overcome the presumption that his wife was impregnated by him at some intervening date during the conceded marital relations.

" If the defendant raises the defense of sterility, it must be based upon the examination of his seminal fluid by a scientific expert in the field of male reproduction, to determine the presence or absence of motile spermatozoa. * * * If the expert testifies to a state of sterility on the date of the examination, that testimony is not sufficient. The expert must give his opinion as to how long that condition existed and, specifically, whether it existed on the date of the alleged act of intercourse. * * * A man, of course, may be examined today and found to be sterile. The crucial question is: Was he sterile at a given previous period of time?" (Schatkin on Disputed Paternity Proceedings [2d ed.], pp. 366–367.)

" More errors are made as a result of faulty collection of the semen than in any other single step in the examination of the husband. The ideal system would permit a sample of the ejaculate to be produced in contact only with the substances found in vivo, and to be preserved under the same conditions of gas tension found in the human genital passages." (Hotchkiss on Fertility In Men, p. 102.)

" Patient then realized that the first attempt to collect the specimen probably did not end in a true ejaculation. The nervousness induced by the strange surroundings of a physician's office made the sexual act difficult. The secretions examined were probably only fluids from the urethral, Cowper's and prostate glands." (Hotchkiss on Fertility In Men, p. 153.)

---

* Cf. *People* v. *Guiseppe*, 97 N. Y. S. 2d 486 [SMYTH, J.], affd. 276 App. Div. 1102.

Tragically pertinent to the case at bar is this further observation of above-quoted Dr. Robert S. Hotchkiss, a leading expert: " Our factual knowledge has not yet reached the point where we can unreservedly state that certain sterile men will never regain their fertility * * * The risks of dogmatic declarations are evidenced by contemplation of the repercussions which might follow a statement to the husband that he is ' permanently sterile.' Should he by some unusual method regain or improve his fertility and a pregnancy take place, he will probably doubt his paternity. Such an unjustified suspicion may dissolve a marriage." (Hotchkiss on Fertility In Men, p. 157.)

As against the inconclusive medical testimony, on the one hand, there are, on the other, an accumulation of countervailing factors, namely the strong presumption of the child's legitimacy, the conceded continuance of marital intercourse between the parties until several months after its birth, respondent's payment of the confinement expenses, his claiming the child as a dependent for income tax purposes, the belatedness of his disclaimer of paternity, the dearth of identification of any paramour or proof of any inclination of petitioner to infidelity, and her own positive and credible testimony.

Accordingly, upon the entire record, the court hereby finds that the allegations of the petition have been sustained by a fair preponderance of the evidence; respondent is hereby held chargeable with the support of the wife and child named in the petition, on a separate maintenance basis and according to his means (Dom. Rel. Ct. Act, § 92, subd. 1 and § 101, subd. 1); and he is therefore hereby ordered and directed to pay into this court, until further order, for their support, the sum of $45 semimonthly, each and every semi-month, beginning July 17, 1950, until further order of the court.

Today's final order is in the same amount as the temporary order figure set on November 9, 1949 (after respondent's removal from the apartment in the two-family house owned by petitioner's father where the wife and child still reside). It is based on respondent's present net semi-monthly compensation of $158.11 (i.e. a gross of $172.91 after deduction of withholding tax of $5.20 and $14.70 for pension), but takes into account respondent's obligation to pay $45.04 each month to Municipal Credit Union and $29 each month to the X Bank of New York in liquidation of substantial loans. But since $45 semi-monthly is less than the fair and reasonable sum to which

the wife and child are entitled and which would be awarded if respondent's actual net income presently permitted, this order is subject to modification upwards according to the customary rules and practice of this court when and as each of those loans will have been respectively liquidated. Respondent should therefore avoid incurring any new loans and budget his personal expenditures accordingly.

Today's order assumes that by reason of direct payments to petitioner there are now no temporary order arrears. If this assumption be incorrect, that order will be modified by me, upon request, to fix and include the amount of any temporary order arrears and the method of payment thereof, pursuant to Family Court Rule XIV, subd. c (Bender's Court Rules, 1947 Edition, p. 368), which provides that any temporary order arrears should be deemed to be merged in the final order and cancelled, unless the court embody in the final order express directions as to the amount and method of payment of any temporary order arrears so carried over and made part of the final order.

Notice shall be given pursuant to the subjoined direction.