315 P.2d 866

**PACIFIC GUANO COMPANY, a corporation, Appellant.**

v.

**George L. ELLIS and Rachael Ellis, his wife, Appellees.**

No. 6183.

Supreme Court of Arizona.

Sept. 30, 1957.

Rehearing Denied Oct. 22, 1957.

Ryley, Carlock & Ralston and Sam P. Applewhite, III, Phoenix, for appellant.

Fennemore, Craig, Allen & McClennen and Philip E. Von Ammon, Phoenix, for appellees.

WINDES, Justice.

Pacific Guano Company, a corporation, filed complaint against George L. Ellis and his wife, Rachael Ellis, alleging that defendants in July, 1952, contracted in writing to purchase fertilizer for which defendants refused to pay and prayed for judgment for the purchase price. Defendants counterclaimed in two counts, the first alleging in substance that in June, 1952, the parties entered into a contract whereby

plaintiff agreed to sell defendants fertilizer and through its agents apply the same to defendants' cotton crop in quantities adequate for fertilization. This count also alleges that pursuant to the agreement plaintiff applied the fertilizer in such a negligent manner that defendants' crop was damaged and the yield reduced. The second count of the counterclaim is for the same damage but the theory of liability is the breach of an alleged implied covenant to make application of the fertilizer in a workmanlike manner. The reply to the counterclaim consists of a general denial and an allegation that if the crop was damaged, the proximate cause thereof was lack of sufficient irrigation water and the negligence or contributory negligence of defendants in not properly caring for the crop. A jury trial on the issues thus framed resulted in a verdict and judgment on the counterclaims in defendants' favor in the sum of $30,961. Plaintiff appeals and will be referred to herein as the company and the appellees by name or as counterclaimants.

■ One of the major questions presented is whether the evidence would authorize the jury to return any verdict in favor of Ellis. It is contended by the company that there is no proof of any agreement between the parties whereby it was agreed that the company would apply the fertilizer to Ellis' land and that even if such an agreement had been entered into by the agent of the company, the evidence does ont warrant a finding that he had either actual or apparent authority to make the same. On this question of whether the jury could be allowed to find that the agent of the company did make an agreement with Ellis to apply the fertilizer to his land, there was evidence that a Mr. Corbus, a salesman for the company solicited Ellis with the view of selling him the company's product for the purpose of fertilizing his cotton crop. The fertilizer was of a character that was to be applied by injection in the ground alongside the plant with the use of equipment attached to a tractor. Ellis had no equipment that would serve this purpose and had never done any such work. The agent told Ellis there was a man by the name of Crumbaker who did such work and took care of his customers and he (Corbus) would get in touch with him and see that there was a man available to do the work. Corbus quoted Ellis a per acre cost for the fertilizer and its application and Ellis told him to go ahead. Thereafter, Ellis never contacted anyone to perform this service but the evening before the work started a man with a tractor asked permission of Ellis to park his tractor on the land concerned. Another man followed him in a pickup and took him home. Ellis knew neither of these men. The next day the injection work started. The tractor driver and the salesman Corbus were there. Ellis gave no instructions concerning how

the work was to be performed. From this evidence the jury was entitled to determine that Corbus, the company's salesman, did agree that the company would perform the service of injecting the fertilizer sold to Ellis.

■ The company contends that its salesman had no authority to make such a contract that would be binding upon it. There was introduced into evidence a written contract of agency between Corbus and the company. This contract did not expressly authorize the agent to contract for injection nor did it expressly prohibit such an agreement. The company argues that, there being no express authority, the company cannot be bound because the evidence does not warrant a finding of ostensible or apparent authority. This is not exactly correct. In the absence of express authority, for one to be bound by an act of a purported agent, the evidence must be such as to justify a finding there was either actual implied authority or apparent authority. Either of these must be created by some conduct of the principal. The former may be founded on the principal's acquiescence to an agent's course of conduct which justifies the reasonable conclusion that actual authority was given though not in express language. This is implied authority and, if such exists, knowledge by the person dealing with the agent of the course of conduct which creates it is of no importance but knowledge of the principal is essential. There is a distinction between implied authority and apparent authority. Restatement of Law, Agency, section 8(d). If implied authority is found to exist, whether there was apparent authority becomes immaterial. When there is in fact no actual express or implied authority, dependence must be placed upon apparent authority. To bind a principal on the basis of apparent authority the principal's conduct must be such that the law will not permit him to say he did not give the agent the authority. In such instance the person dealing with the agent must have knowledge of the principal's conduct and have been misled thereby. Moore v. Switzer, 78 Colo. 63, 239 P. 874. It is possible but not necessary that actual implied and apparent authority be co-existent. There being no express authority, for the jury to be allowed to find Corbus could bind the company, the evidence must be such as to justify it in determining that the agent possessed such authority by implication. If the evidence is such that reasonable men might conclude that the company intended that its agent, within the scope of his agency in selling this product, be allowed to contract with the purchaser to inject the same, the jury would be legally justified in finding that the agent had implied actual authority to make such a contract on behalf of the company, irrespective of whether the evidence might justify a finding of apparent authority.

Unquestionably, Corbus, the company's salesman, made the arrangements with Crumbaker for the injection work. Ellis neither contacted nor knew Crumbaker. The company paid Crumbaker for his services and billed Ellis for the charge. Corbus was present when the work started and made several visits thereafter during its progress. Ellis according to his testimony made no attempt to supervise or control the work except when he thought it was not being done properly and contacted Corbus with the request that he take steps to effect a correction. This method of selling the fertilizer and securing Crumbaker on like terms to apply it had to the knowledge of the company been a matter of practice in dealing with other customers. The company recognized these dealings, paid Crumbaker and billed the customers. The jury under such circumstances could infer that the company had given Corbus actual implied authority to secure on its behalf the services of the operator as a part of its marketing program.

■ The company claims it was entitled to a directed verdict for the reason that the counterclaimant did not produce sufficient evidence to legally allow the jury to find any breach of contract or negligence in the application of the fertilizer. The combined testimony of Ellis and his foreman was to the effect that in their opinion the tractor was operated too rapidly at seven or eight miles per hour when it should have been three and a half to four miles per hour; that the injection equipment zigzagged and ran into the cotton rows uprooting some of the plants; that examination revealed some of the feeder roots had been cut off; that in some two to four days following fertilization the cotton began to burn, leaves dried and blooms fell off. There were 30 acres of the field that were not subjected to the fertilizer which were farmed and watered in the same manner as the portion which was injected. This cotton showed no evidence of damage and produced a much better yield than the fertilized portion. If the jury is allowed to believe this evidence, unquestionably it would be entitled to conclude that the product was improperly applied and such improper application was the cause of the damage to the plants. Contradicting this evidence the company submitted the person who said he sold the tractor new in 1941 and testified he was familiar with the machine, had driven it without a pulling load and its maximum speeds in fourth, third and second gears were respectively five and three-fourths, four and three-tenths and three and three-tenths miles per hour. Crumbaker and Hicks (tractor operator) testified it was impossible for the injection equipment to have wobbled and zigzagged, and expert testimony was presented to the effect that the amount of nitrogen injection could not damage the plants and that plants damaged

18

by this character of burning would have a different color than that described by Ellis and his foreman. Likewise, expert testimony was submitted concerning the amount of water necessary to properly grow and produce a cotton crop which was more than the amount used by Ellis. From this the company argues that the testimony of Ellis and his foreman is unbelievable because it could not possibly be true. We are unable to agree with this position. Most of the evidence submitted by counterclaimant was from observation and practical result. Much of the testimony to the contrary was opinion evidence of what theoretically should have been the result. The reasonableness or unreasonableness of counterclaimant's and the foreman's testimony is a matter for the jury to consider in weighing the entire testimony but it is not of such a nature that compels the jury to disbelieve their entire testimony. The jury is not required to disbelieve the testimony that 30 acres not fertilized produced a good crop and that portion fertilized produced a poor one with the same method of irrigation merely because experts said in their opinion it could not be done. The jury is not compelled to say that the detrimental effect on only that portion fertilized shortly after application was due to lack of water merely because an expert testified that the color of the damaged plant was different from what it should have been if caused by the fertilization. The jury might reasonably infer

from this conflicting evidence that the product was improperly applied and the improper application was the more probable cause of damage to the crop.

■ Over the company's objection the court permitted Ellis to submit rebuttal evidence to the effect that in 1954 he farmed 310 acres of land 2½ miles west of the land involved herein, 230 acres to cotton; that he used the same sprinkler system with the same pumping equipment, with the same frequency of sets; and that it produced approximately 1½ bales per acre. The court properly admitted this testimony. One of the main contentions of the company is that insufficient water was the cause of the low yield. The jury could infer that under substantially the same conditions with substantially the same amount of water, 1½ bales per acre could be produced on adjoining land.

■ It is argued that the evidence will not justify the amount of damages found by the jury. The suggestion is that it was necessary for the jury to have found a definite number of bales per acre loss; that their calculation must have been to the effect that Ellis could have grown 1½ bales per acre in the absence of the improper application of the fertilizer; and there is no evidence to support such finding. In this respect the jury could have concluded that the 30 acres not fertilized produced approximately two bales per acre. There was evidence that the following year Ellis

stubbed 140 acres watered in the same manner and to the same extent as the year before and harvested therefrom 180 bales of cotton. He testified that stubbed cotton produces about 80 percent of what can be produced with planted cotton. The net effect of this testimony is that if he had planted instead of stubbing cotton, he could have produced slightly over 1½ bales per acre. As heretofore stated Ellis testified that in 1954 by the same method of irrigation, he produced approximately 1½ bales per acre on an adjoining tract. Damages of this character are not subject to exact proof. Many factors influence productive results. If the jury's computation is reasonably within the range of the evidence bearing thereon, the court will not disturb it. We cannot say the evidence does not justify the damages calculated by the jury. Nor can we say, as we are asked to do, that the verdict is the result of passion and prejudice.

■ Error is assigned because the court refused an instruction telling the jury that the uncontradicted testimony of expert witnesses to the effect that Ellis did not have sufficient water for adequate irrigation of his cotton crop and that since the subject matter of such evidence was not within the common knowledge of laymen and within the exclusive province of specialists' study, the jury is not permitted to arbitrarily reject it. In view of the evidence in this case the refusal was proper.

In the light of other evidence heretofore related, the jury had the right if it saw fit to decide the crop did receive adequate water and it was not required to give any particular weight to the experts' opinions. The jury is not compelled to believe the experts' opinions in the face of evidence of practical results indicating otherwise.

■ It is claimed the trial court erred in not permitting witness Pickrell to answer the following question:

"In Maricopa County in 1952, when a fertilizer company sold fertilizer to a farmer and it was injected by a custom operator, what was the general understanding of the farming community as to who controlled the work of the custom operator?"

The witness Crumbaker was allowed to testify to the effect that it was the custom in Maricopa County for custom work of this nature to be done under the supervision of the farmer for whom the work was being done. We do not think that the failure to allow witness Pickrell to answer the foregoing question, if it were error, could possibly be prejudicial. With other evidence to the same effect, Mr. Pickrell's answer could not possibly be of such importance as to have caused a different verdict.

Judgment affirmed.

UDALL, C. J., and PHELPS and JOHNSON, JJ., concur.

STRUCKMEYER, J., having announced his disqualification, took no part in the determination of this appeal.