460 P.2d 32

**ANONYMOUS, Appellant,**

**v.**

**ANONYMOUS, Appellee.**

**No. 2 CA–CIV 555.**

Court of Appeals of Arizona.

Division 2.

Oct. 22, 1969.

Review Denied Jan. 20, 1970.

William E. Netherton, Tucson, for appellant.

Schroeder & Soelter, by Ralph Soelter, Tucson and Nasib Karam, Nogales, for appellee.

JACOBSON, Judge.

The classic confrontation of advancing medical technology versus judicial presumptions is presented in this case of first impression in Arizona arising out of an action in Pima County dealing with the use of blood grouping tests in paternity actions.

In consideration of the welfare of the child herein involved, we have refrained from naming the parties in this decision. The appellant-defendant and appellee-plaintiff, were married on May 13, 1966. Marital difficulties arose almost immediately culminating in a separation of the parties on June 12, 1966. At this time the plaintiff moved from defendant's household and the parties agreed to a trial separation for six months, a condition being the abstinence from sexual relations during this period.

During the trial separation period the parties dated each other frequently but both agreed the condition above referred to was followed. The observance of this condition of abstinence continued until the early morning hours of January 1, 1967. Plaintiff testified that following a dance on the evening of December 31, 1966, an act of sexual intercourse occurred between the parties. Defendant denied such an occurrence.

Because of increasing marital difficulties and the apparent failure of the trial separation, plaintiff filed suit for divorce on January 10, 1967. The divorce was uncontested by defendant and a decree of divorce was entered on February 10, 1967, granting plaintiff an absolute decree of divorce and restoring her maiden name. This decree was silent as to any children or plaintiff's condition of pregnancy. In May of 1967, plaintiff's doctor confirmed that she was pregnant. The testimony is in dispute as to whether defendant acknowledged parentage at this time; however, the matter not being resolved, plaintiff on September 1, 1967, filed a Petition for Modification of the decree of divorce seeking medical expenses, lying-in expenses and support for the expected child. Defendant appeared and denied paternity of the child. On September 20, 1967, plaintiff gave birth to a full-term, nine-pound two-ounce baby.[1] At the time of the trial of this matter, the child was approximately two and one-half months old.

At the close of defendant's case, defendant moved for a directed verdict based primarily upon the testimony of Dr. Louis Hirsch, a pathologist. He testified that as a result of blood grouping tests taken from the plaintiff, defendant and the child, defendant was medically excluded as the father of the child. The motion was denied and the matter submitted to a jury who found that the defendant was the father of plaintiff's child. Defendant duly moved for judgment N.O.V. or for a new trial, again urging the exclusionary testimony of Dr. Hirsch. All of defendant's post-trial motions were denied and this appeal followed.

The factual situation presented by this case brings into sharp focus the weight to be given by Arizona courts to exclusionary blood grouping tests in paternity actions. On the one hand is the fact, implicit in the jury's findings of paternity, that intercourse between the defendant and plaintiff occurred at a time during which conception was possible; that defendant is not impotent; and that at the time conception could

---

1. The January 1, 1967, date of alleged conception is compatible with this birthdate.

have occurred plaintiff and defendant were married. Standing alone against this evidence is the exclusion of defendant as the father because of blood grouping tests.

Since this is a case of first impression in Arizona, an explanation of blood grouping tests is in order. Blood groups refer to the properties of red blood corpuscles which cause them to clump together when in contact with appropriate anti-sera, the process being known as "agglutination." A substance in the blood cells which is capable of producing an element having the power of agglutination is designated as one of the agglutinogens. The substance in the anti-sera which causes agglutination is designated as an agglutinin. These substances—agglutinogens and agglutinins—are capable of identification through their reaction to one another. By classifying these reactions, scientists have established systems of blood groupings to include all human beings. The most familiar of these types are the ABO group, the MN type and the Rh type. (See K. B. Brilhart, M. D., Medical Evidence to Exclude Paternity, 1 Ariz. Bar Journal 19 (June, 1965).)

The agglutinogens and agglutinins present in an individual's blood are hereditary characteristics and therefore capable of being used for identification purposes. To understand adequately how identification can be possible, it is necessary to explain, briefly, the genetic laws originally formulated by Gregor Mendel (Mendelian Laws). A person's biological makeup (color of hair, physical characteristics, blood types, etc.) becomes fixed at the time of impregnation of the mother's ovum by the father's sperm. The inheritance of these biological substances is governed by genes, which occur in rod-like groups or lumps called chromosomes. When reproduction takes place the two groups of chromosomes separate, each joining with some other chromosome to later form a new cell. This pairing of chromosomes takes place according to the biological character of each chromosome or gene. For example, the maternal chromosome that contains the color of eyes pairs off with the corresponding paternal chrom-osome controlling eye color, and the maternal blood type chromosome pairs off with the corresponding paternal blood type combination. Thus, if the blood groupings of both mother and father are known, the blood grouping of the child may be predicted. Conversely, if the blood groupings of one parent and the child are known, the blood grouping of the other parent can also be determined.

Both the existence of various blood types and Mendel's Law of Hereditary Characteristics are universely accepted in scientific fields. 1 Wigmore on Evidence Section 165a (3d ed. 1940).

With this background in mind, the testimony of Dr. Hirsch, as to the result of blood grouping tests, shows that defendant was not excluded from an analysis of the ABO Blood grouping, nor the MN blood typing, but was excluded under the Rh typing:

"(Dr. Hirsch) The putative father was grouped as a little "c". The putative mother was grouped as a big "C" and a little "c" and the child was grouped as a big "C" * * *.

"The child has two big "C's"; consequently there was no place for this child to have gotten two big "C's". He got— we know where he got one, from the mother, because it was demonstrated there but it must have gotten the big— other big "C" elsewhere.

"Q: In other words, it would have been impossible for that child to have gotten a big "C" from the defendant in this case, Mr. _____?

"A: Yes, sir.

"Q: Because he didn't have a big "C"?

"A: That's correct."

By judicial decision or by statute, most states admit evidence of blood grouping tests to disprove paternity, but not to show paternity. Kusior v. Silver, 54 Cal.2d 603, 7 Cal.Rptr. 129, 354 P.2d .657 (1960); Beck v. Beck, 153 Colo. 90, 384 P.2d 731 (1963); Retzer v. Retzer, D.C.Mun.App., 161 A.2d 469 (1960); Jordan v. Davis, 143

Me. 185, 57 A.2d 209 (1948); Commonwealth v. D'Avella, 339 Mass. 642, 162 N. E.2d 19 (1959); State v. H. L., 61 N.J. Super. 432, 161 A.2d 273 (1960); Anonymous v. Anonymous, 1 A.D.2d 312, 150 N.Y.S.2d 344 (1956); State ex rel. Steiger v. Gray, Ohio Juv., 3 Ohio Op.2d 394, 145 N.E.2d 162 (1957); Roberts v. Van Cleave, 205 Okl. 319, 237 P.2d 892 (1951); State ex rel. Wallock v. Brigham, 72 S.D. 278, 33 N.W.2d 285 (1948).

■ The weight to be given these tests in determining the issue of paternity has been one which has caused some confusion in the law. The differing opinions, in most instances, are a result of the "presumption of legitimacy" rule. In Arizona the rule is that if a husband had access to his wife so that by the laws of nature he could be the father of a child born in wedlock, it must be presumed to be his. State v. Mejia, 97 Ariz. 215, 399 P.2d 116 (1965). While in the case before us the birth of the child actually occurred after the marriage was terminated, conception, according to the plaintiff, occurred during the marriage. Therefore, in our opinion, this presumption which has been designated by Judge Cardoza[2] "as one of the strongest and most persuasive known to law" is still to be given consideration. Jackson v. Jackson, 182 Okl. 74, 76 P. 2d 1062 (1938).

■■ While Arizona has eliminated the status of illegitimacy by statute, A.R.S. Section 14–206 (1956), the presumption referred to above still prevails in those situations where a child is born of a married woman and the father of the child is alleged to be someone other than her husband. This presumption of legitimacy is not, however, conclusive, but is merely that—a presumption—which is overcome when rebutted by clear and convincing evidence. State v. Mejia, supra.

Is, then, evidence of *properly conducted* blood grouping tests which excluded the husband as the father of his wife's child clear and convincing? In our opinion, such evidence is not only clear and convincing, but is conclusive of the question. Beck v. Beck, supra; Anonymous v. Anonymous, supra. To hold otherwise would be tantamount to this court, by judicial decree, declaring the laws of motion and gravity to be repealed.

■■ This does not mean that courts should abdicate their traditional role as seekers of truth to the laboratories of scientists and medical experts. The key words in reaching this decision are "properly conducted." In order for a particular blood grouping test to reach the pinnacle of infallibility to which we have elevated it, there must be a close scrutiny of the soundness of the scientific procedures followed and a sharp delving into the skill of the supervising expert. Mistakes can occur through difficulty in the laboratory's obtaining proper anti-serum of a sufficient strength and classification; mistakes may arise as to some individuals from the presence in their blood serum of blocking antibodies which may be present because of transfusions or pregnancy; mistakes may develop through failure to follow testing methods recommended by manufacturers of the anti-serum employed; mistakes may occur through failure of the laboratory technician to observe the clumping process, either through lack of skill or inattention; further mistakes may occur, especially in the Rh grouping test, because of lack of skill of the individual conducting the test. (See 4 R. Gray, Attorneys' Textbook of Medicine Paragraph 304.08–.13 (3d ed. 1968) for a comprehensive analysis of these problems.) These problems and others must stand the bright light of judicial inquiry. While the transmission of blood groupings may be a natural law, the manner in which these blood groupings are determined is subject to the human frailties inherent in all human conduct. When the trier of fact has satisfied itself by clear and convincing evidence of the qualifications of the expert

---

2. In re Findlay, 253 N.Y. 1, 170 N.E. 471 (1930).

and that the procedures under which the tests were obtained were proper, then and only then, may the stamp of conclusiveness be placed upon them. Jordan v. Mace, 144 Me. 351, 69 A.2d 670 (1949); Commonwealth v. D'Avella, 339 Mass. 642, 162 N.E.2d 19 (1959). If there is no evidence, over which reasonable men may differ, to impugn the integrity of these tests, the court should grant the appropriate relief without submission of the question to the jury. State ex rel. Steiger v. Gray, Ohio Juv., 3 Ohio Op.2d 394, 145 N.E.2d 162 (1957).

The plaintiff through her briefs and at the time of oral argument calls into question the validity of Dr. Hirsch's testimony. In reading the transcript and plaintiff's arguments, these objections go, not to the interpretation of the test results by Dr. Hirsch, but to the manner in which the results were obtained. A review of the proceedings at the time of trial is necessary for a clear understanding as to whether or not the appellee is now in a position to urge that the tests were improperly conducted.

Two days prior to trial, by stipulation [3] of the parties, blood tests were conducted on the principals involved by a laboratory selected by Dr. Hirsch.

At the time of the taking of the tests, Dr. Hirsch was out of town and these were conducted by laboratory technicians employed by Dr. Hirsch. After the tests were conducted Dr. Hirsch returned to analyze and evaluate the results.

To accommodate Dr. Hirsch, he was called out of order by defendant, during plaintiff's case. Prior to the doctor's testimony concerning the results of tests taken, objection was made to the doctor's testimony on the ground of lack of foundation because "the doctor was not the one who handled the examination of any of these individuals."

Following voir dire examination of the doctor by plaintiff's counsel to establish this, the following took place:

"Mr. Karam: (plaintiff's counsel) I object to it. There is no foundation.

"The Court: Sustain the objection unless you avow, Mr. Netherton (defendant's counsel), that you plan to bring in a person that—

"Mr. Netherton: We will bring in any technicians, your Honor, who actually took the blood and we will avow to the Court that any deficiency in the foundation will be corrected.

"Mr. Karam: That's all I wanted him to make that avowal."

Dr. Hirsch then proceeded to testify without further foundational objections by plaintiff's counsel. This exchange occurred on December 7, 1967. On December 8, 1967, the minute entries of the Court revealed the following:

"The Court states that prior to commencement of the afternoon session and

3. The stipulation of the parties is as follows:
"This matter having been set for trial at this time, counsel enter into the following stipulation: That both parties and the child be given blood tests at the laboratory selected by Dr. Louis Hirsch. If the results of the examinations in the opinion of Dr. Hirsch show that the Defendant is in the included group; that is, that the tests show that his blood type is compatible with parenthood of the child, then the Defendant agrees that he is the father of the child; and the Court shall proceed to hear matters concerning what reasonable amount should be paid by the Defendant for expenses in connection with the birth of the child, Court costs, attorney's fees, and future child support. If the blood tests show that the Defendant's blood is in the excluded group; that is, that it is not compatible with parenthood of the child involved, the Plaintiff shall first have the right to have such findings rechecked by Dr. Hirsch or another doctor. After a reasonable time for such recheck, the matter may then, at the Plaintiff's option, proceed to trial.
"It is stipulated that a jury shall be used only if the issue of parenthood remains in the case and such jury shall be used only for the issue of parenthood."

prior to commencement of the Defendant's case, in chief, counsel stipulated in chambers that the defense need not call the laboratory technicians for foundation testimony in connection with Dr. Hirsch's testimony."

Defendant called no further foundational witnesses relative to Dr. Hirsch's testimony.

Stipulation between counsel designed to simplify litigation and to save cost to the parties are favored in the law. Assignment of Rich Hardware Co. [Crunden-Martin Mfg. Co. v. Christy], 22 Ariz. 254, 196 P. 454 (1921).

In view of the manner in which the stipulation of counsel to forego the calling of the laboratory technician who actually conducted the blood tests arose, and the prior stipulation that the blood tests were to be conducted at a "laboratory selected by Dr. Hirsch," the conclusion is inescapable that all objections as to the manner in which the tests were conducted and the determination of the blood types involved was waived and therefore the testing procedure was proper. Cf. Rose v. Rose, 16 Ohio App.2d 123, 242 N.E.2d 677 (1968).

■ Although stipulations in open court as to facts are binding and conclusive on the court, the parties for good cause shown may be relieved by the court from their binding effect. Higgins v. Guerin, 74 Ariz. 187, 245 P.2d 956, 33 A.L.R.2d 769 (1952).

■ Because the question of conclusiveness of blood grouping tests is a matter of first impression in the State of Arizona, and in view of our holding that the manner in which blood grouping tests are conducted is determinative of the validity of these tests and their conclusiveness, we are of the opinion that plaintiff should be granted relief from the foregoing stipulation. Commissioner of Welfare v. Costonie, 277 App.Div. 90, 97 N.Y.S.2d 804 (1950).

Therefore, rather than grant judgment for the defendant, based upon this stipulation, this matter is remanded to the trial court for a new trial. If the new trial is before a jury, proper instructions should be given in accordance with the principles set forth herein.

Judgment reversed and remanded for new trial.

WILLIAM E. EUBANK, P. J., and HAIRE, J., concur.

NOTE: This cause was decided by the Judges of Division One, Department B, as authorized by A.R.S. Section 12–120, subsec. E.