520 P.2d 542

**Richard Conger PYEATTE, Appellant,**

v.

**Carolyn PYEATTE, Appellee.**

**No. 2 CA–CIV 1402.**

Court of Appeals of Arizona, Div. 2.

March 29, 1974.

Rehearing Denied May 7, 1974.

Boyd M. Morse and Bernard L. Lesser, Tucson, for appellant.

Philip Jones, Tucson, for appellee.

## OPINION

HATHAWAY, Chief Judge.

Defendant Richard Pyeatte has appealed from a judgment granting plaintiff Carolyn Pyeatte an absolute divorce, declaring that defendant is the father of plaintiff's son, and ordering that he pay plaintiff $125 per month as alimony and $125 per month as child support.

The parties began dating in February, 1971. They had sexual relations for the first time in April, 1971. In May, 1971, the parties began living together and their sexual relations intensified. About the third week in July, plaintiff discovered that she was pregnant. Upon being informed of the pregnancy, defendant asked plaintiff to marry him. The parties were married on August 3, 1971. They separated 37 days later. Plaintiff sued for divorce in October, 1971. She gave birth to a son on March 24, 1972. Trial of the divorce action began on August 31, 1972.

Plaintiff was 25 years old at the time of the trial and had worked as both a waitress and a nurse's aid. Defendant was 40 years old and was working as a law enforcement officer.

Defendant's first contention is that the trial court's finding that he was the father of the child was not supported by a preponderance of the evidence. Defendant was confronted at trial with the presumption that a child born to a married woman is fathered by her husband. This presumption is one of the strongest and most persuasive known to the law. Anonymous v. Anonymous, 10 Ariz.App. 496, 460 P.2d 32 (1969). It is "by no means a mere recognition of probability, but is rather one of the weightiest expressions of legal policy in the law." Shields v. Folsom, 153 F. Supp. 733, 738 (E.D.Pa.1957).

In State v. Mejia, 97 Ariz. 215, 399 P.2d 116 (1965), our Supreme Court held this presumption to be in effect despite the fact that our legislature has eliminated the status of illegitimacy. See A.R.S. § 14–206. The court held that the party opposing the presumption must rebut it by "clear and convincing evidence". 97 Ariz. at 218, 399 P.2d at 118. The presumption of legitimacy permanently shifts the burden of persuasion (here by clear and convincing evidence) to the party opposing it. Therefore, our standard of review on appeal is whether defendant, as a matter of law, clearly and convincingly, established that he is not the father of the child.

Defendant introduced evidence that he was sterile as proof of non-paternity. In order to save time at trial, the parties stipulated to the admission of the deposition testimony of Dr. C. J. Hoffman who had performed fertility tests on defendant in November and December, 1971. Dr. Hoffman is experienced in urology [1] and there was no challenge to his qualifications. He

concluded that defendant was sterile *at the time of the tests.*

Dr. Hoffman also testified that defendant had spoken to him concerning his medical history. He related that he had been born with undescended testes [2] which were treated with hormone injections when he was 9 or 10 years old and that after 10 years of married life with 5 different wives, he had created no pregnancies.[3] Although he did not know the extent of the hormone treatments, Dr. Hoffman testified that 60% of adults who receive that particular treatment are permanently sterilized. He testified that based upon this history and the test results, he believed that defendant was also sterile *at the time the baby was conceived* (June or July, 1971) and that he did not think defendant could have been its father.

On the other hand, plaintiff testified that she had not dated or gone out with any man other than the defendant in June or July of 1971. Defendant admitted that he regularly had intercourse with plaintiff during the period in which the child was conceived. Plaintiff testified that they often had sexual relations "five or six times a week" during June and July, 1971.

We therefore are faced with what Division One of this court termed a "classic confrontation of advancing medical technology versus judicial presumptions. . . ." Anonymous v. Anonymous, supra, 10 Ariz.App. at 497, 460 P.2d at 33. In that case, the court held that properly conducted blood grouping tests which excluded a husband as the father of his wife's child were not only clear and convincing, but also conclusive of the question.[4]

---

1. Urology is a branch of medicine or surgery dealing with the urine, the urinary tract, and the reproductive organs.

2. Both defendant and his mother testified to this at trial.

3. Defendant testified that some of his ex-wives later had children fathered by other men and that two, while married to him, had

consulted doctors in their efforts to become pregnant.

4. Although the authorities cited below were not introduced into evidence and are a result of this court's independent research, we have considered them in arriving at our decision as to the degree of conclusiveness which the results of sterility tests should have in the

The case law dealing with medical evidence of sterility arises from two distinct factual situations. One area is that in which the mother was unmarried and no presumption of legitimacy is applicable. These are usually paternity proceedings in which the state attempts to prove a man to be the father of a usually unmarried mother's child. See A.R.S. § 12–841 et seq. In these cases, medical testimony of sterility has been given greater weight since the state has the burden of proving paternity (in many states the proof must be by more than a preponderance of the evidence). In re Stroope's Adoption, 232 Cal.App.2d 581, 43 Cal.Rptr. 40 (1965); Potasz v. Potasz, 68 Cal.App.2d 20, 155 P.2d 895 (1945); Commr. of Welfare v. Wendtland, 25 A. D.2d 640, 268 N.Y.S.2d 547 (1966); Hogeboom v. Hurlburt, 207 Misc. 997, 141 N.Y. S.2d 691 (1955); Timm v. State, 262 Wis. 162, 54 N.W.2d 46 (1952); compare People v. Guiseppe, 97 N.Y.S.2d 486 (Ch.Ct. 1949).

Into the other broad area falls the situation with which we are here confronted— the husband (and alleged father) introducing evidence of sterility to rebut the presumption of legitimacy. With but one possible exception, we have found no appellate case in this area reversing a lower court's finding of paternity when medical evidence of sterility had been introduced by the husband. In Groner v. Groner, 23 Cal.App.3d 115, 99 Cal.Rptr. 765 (1972) a trial court's finding of paternity was reversed but it had been stipulated on appeal that the husband was "sterile and unable to procreate". (99 Cal.Rptr. at 765). On the other hand, we have found numerous decisions upholding trial court rulings that the presumption of legitimacy was not conclusively overcome by medical evidence of sterility. Lucas v. Williams, 218 Md. 322, 146 A.2d 764 (1958); Tosh v. Tosh, 214 Cal.App.2d 483, 29 Cal.Rptr. 613 (1963); Houston v. Houston, 199 Misc. 469, 99 N.Y.S.2d 199 (1950); Shepherd v. Shepherd, 314 Ky. 575, 236 S.W.2d 477 (1951); Smith v. Smith, 71 S.D. 305, 24 N.W.2d 8 (1946); Whitman v. Whitman, 215 N.E.2d 689 (Ind.App.1966).[5] In each of these cases, appellate courts have refused to reverse findings of paternity (i. e., hold that the husband's burden of proof was met as a matter of law) despite testimony of medi-

courts of this state. See Anonymous v. Anonymous, supra.

In Schatkin, Disputed Paternity Proceedings, p. 741 (4th ed. 1967), the author compares blood tests with evidence of sterility: "The science of male reproduction is not in the same category as blood tests. There is, it seems, an element of scientific controversy in this field and the matter is to a certain extent the subject of experts' conflicting opinions . . . when one considers that only a single spermatozoon actually impregnates the ovum, the only absolute proof of sterility is absence of testicles or complete absence of spermatozoa from the semen due to atrophy or disease of the testicles or blockage of the vas deferens, the tube through which the spermatozoa are exuded."

In A. Santomauro, J. Sciarra & A. Varma, A Clinical Investigation of the Role of Semen Analysis and Post Coital Test in the Evaluation of Male Infertility, 23 Fertility and Sterility, 245 (April 1972), the authors conducted semen tests on various fertile and infertile males. A small percentage who had sperm counts and motility in a category similar to defendants eventually conceived children. The authors concluded:

"From the data presented in this study, it can, therefore, be concluded that approximately 90% of all males whose semen analyses persistently show a density of less than 10 million/c.c., a motility of less than 40% and a T.M.C. [total motile count] of less than 10 million are infertile [defendant falls within this category] . . . Although it is highly probable that any male whose semen analysis parameters falls within these lower ranges is infertile, it is *not* possible to conclude from these data the statistical probability of infertility for a particular individual. There are too many factors affecting fertility potential which are not measured by the semen analysis." (Emphasis in original)

See also J. MacLeod & R. Gold, The Male Factor in Fertility and Infertility, 2 Fertility and Sterility 187 (1951).

5. Other courts have upheld trial court rulings of non-paternity based upon evidence of sterility. Gray v. Richardson, 340 F.Supp. 680 (N.D.Ohio 1972); Hughes v. Hughes, 125 Cal.App.2d 781, 271 P.2d 172 (1954).

cal experts that the husband was sterile. By and large, it therefore appears that evidence of sterility has been given much less weight than the blood test exclusion.

Dr. Hoffman described the various data relevant to fertility which he had gleaned from the two semen tests. First the quantity or count of the sperm was below the normal level. Second, the motility (mobility of the sperm necessary for fertility) was very low. Together with the medical history related to him by defendant, these two facts were the primary basis for Dr. Hoffman's conclusion of sterility at the time of conception. However, Dr. Hoffman testified that no one could state as "an absolute fact" that defendant could not have produced the pregnancy in June or July, 1971—only that it was "highly improbable."

We also note that defendant's medical history of undescended testes was not corroborated by medical evidence. This was crucial to Dr. Hoffman's opinion that defendant was sterile *at the time of conception*. Further, unlike blood grouping tests which are taken in a clinical setting, defendant produced the semen specimens at his home and brought them to Dr. Hoffman's office for examination. Defendant had been instructed to abstain from intercourse from three to seven days and to bring the specimen in within two hours of its production. Although Dr. Hoffman testified that prior intercourse affects only quantity and not motility and that an examination of the specimen can determine its age, the integrity of the specimen rested to some extent upon the defendant who was highly interested in the outcome of the tests.

█ █ The trier of fact is not compelled to believe expert opinion in the face of evidence of practical results indicating otherwise. Pacific Guano Co. v. Ellis, 83 Ariz.

12, 315 P.2d 866 (1957). Here there was evidence of repeated intercourse between plaintiff and defendant during the period of conception and a denial by plaintiff of access to other men during this time. Taken together with the lack of total conclusiveness inherent in a medical determination of sterility, we cannot hold as a matter of law that defendant clearly and convincingly established non-paternity.

Defendant's second assertion of error is that the trial court erred in sustaining an objection to a question posed by defendant's counsel on cross examination of plaintiff. Throughout the trial defendant sought to establish and plaintiff denied that she had been visited by a Mr. Frank Williams in her apartment during the period of conception (June—July 1971). Defendant's counsel asked plaintiff if she had ever had sexual relations with Mr. Williams prior to April, 1971 (one to two months before the conception of the child). The trial court sustained an objection on the grounds of immateriality.

Obviously the issue of plaintiff's pre-April 1971 sexual relations with Williams would itself have no bearing on the resolution of the case and would be immaterial.

In State v. Mesquita, 17 Ariz.App. 151, 496 P.2d 141 (1972), Division One of this court ruled that inquiries into the mother's sexual conduct before the time of conception in a paternity action were immaterial and an objection to them properly sustained:

"The previous chastity of the mother was not an issue. Whether she had engaged in intercourse with W.O. so far removed from the date of the birth of the child could not establish facts which would cast doubt upon the defendant's responsibility for the conception of the child."

(17 Ariz.App. at 153, 496 P.2d at 143) [6]

---

6. See also Annot., 104 A.L.R. 84, 85 which contains the following:

"The issue in bastardy prosecutions being the paternity of the child, the character of evidence admissible must bear a definite relationship to the probability of the accused being the father, and within this limitation the general rule has become established that evidence of sexual intercourse between the mother of an illegitimate child and others

Defendant, however, argues that an admission by plaintiff of sexual relations with Williams prior to the period of conception would raise an inference of sexual relations at the time of conception. It is true that evidence of past specific acts tend to establish the character of the actor and his propensity toward that conduct. However, evidence of one's character is generally inadmissible to prove his conduct on a certain occasion. California State Life Ins. Co. v. Fuqua, 40 Ariz. 148, 10 P. 2d 958 (1932); Udall, Arizona Law of Evidence § 114 (1960). In Gallina v. Antonelli, 220 Cal.App.2d 63, 33 Cal.Rptr. 570, 571 (1963), the court concluded as follows:

"The law is well settled that, in filiation proceedings, evidence of the immorality of the mother prior to the period of possible conception is inadmissible, and it is error even to ask questions which are designed to imply acts of immorality *for the purpose of showing bad character*. . . ." (Emphasis added—citations omitted)

We note that there was no jury in this action which would be prejudiced by plaintiff's answer to the question. However, even if there was slight probative value in the excluded evidence, the trial court could properly have concluded that it was heavily outweighed by the time which would be consumed in hearing evidence on every alleged act of immorality on plaintiff's part prior to the time of conception. Accordingly, we hold that the trial court did not abuse its discretion in sustaining the objection.

Defendant next asserts that there was no corroboration of plaintiff's testimony as required by former A.R.S. § 25–317(B) (repealed Laws 1973, Chap. 139 § 1) which was in effect at the time of the action. The purpose of corroboration was to prevent collusion and when, as here, the divorce was vigorously contested and there

was clearly no collusion, only slight corroboration will suffice. Kennedy v. Kennedy, 93 Ariz. 252, 379 P.2d 966 (1963); Spector v. Spector, 17 Ariz.App. 221, 496 P.2d 864 (1972).

As evidence of defendant's "cruel treatment" (a ground for divorce under then A.R.S. § 25–312(2) (repealed laws 1973, Chap. 139 § 1) plaintiff testified that among other things, he had choked her shortly after they were married. Plaintiff's mother testified that she had observed bruises on plaintiff's neck at about that time. This testimony alone supports the trial court's award of divorce.

Defendant's final argument on appeal is that the trial court abused its discretion in awarding plaintiff $125 per month as child support and $125 per month as alimony. The trial court has broad discretion in this area and where there is any reasonable evidence to support the trial court's judgment, it will not be disturbed on appeal. Smith v. Smith, 89 Ariz. 84, 358 P.2d 183 (1960). Factors crucial to the trial court's decision are the financial needs of the wife measured by the social position into which her marriage placed her, the ability of the wife to produce income, and the financial condition of the husband. Porreca v. Porreca, 8 Ariz.App. 394, 446 P.2d 500 (1968). Length of marriage and comparative fault may also be considered. Davis v. Davis, 9 Ariz.App. 49, 449 P.2d 66 (1969).

Plaintiff testified that she was under doctor's orders not to work at the time of trial due to illness. She had been working as a nurse's aid making a gross income of $227 per month. According to her testimony, her monthly living expenses exceed $400. Because of medical problems with the baby, she had been incurring medical expenses of $100 per month.

For the first six months of 1972, defendant earned $4,173 or $695 gross pay

---

than the accused about the time of commencement of the period of gestation is admissible upon that issue, while offers of evidence, unlimited as to time, or referring

to a time when in the course of nature conception could not have taken place, will be rejected as irrelevant and immaterial."

per month. In addition he received a monthly uniform allowance of $25 and monthly military disability benefits of $37. His total gross monthly income was $757. He testified that his monthly expenses were $296.40 and asserted debts of close to $5,000. Certain of defendant's itemized debts seem to be duplicated in his list of monthly expenses. In view of the plaintiff's needs and those of the child as shown in the record, we cannot say that the alimony and support payments were excessive. Although the parties lived together only 37 days, the wife was left with a child born of the marriage. In H. Clark, Law of Domestic Relations, p. 441, § 14.5 (1968), the author writes the following in considering the role of alimony in relation to a mother left with children born of the marriage:

> "The first and most important of all functions of alimony relates to the care of children. Though awards for child support may be made separately from alimony, in a majority of cases young children are placed in the custody of their mother. If she is to be able to care for them adequately, she herself must be supported, alimony being in most cases the only source of support available. Since nearly half of all divorces involve children, this function of alimony has a wide application, but it is seldom directly referred to by the courts."

The plaintiff's illness would appear to be of a temporary nature and her prospects for resuming employment good. At such time defendant may well explore a modification of the award.

Affirmed.

KRUCKER and HOWARD, JJ., concur.