591 P.2d 1010

**Richard James COFFMAN, Petitioner-Appellee,**

v.

**Ursula Gudrun COFFMAN, Respondent-Appellant.**

**No. 2 CA–CIV 2996.**

Court of Appeals of Arizona, Division 2.

Feb. 23, 1979.

Gary W. Ramaeker, Sierra Vista, for petitioner-appellee.

Southern Arizona Legal Aid, Inc. by Christopher Hitchcock, Douglas, for respondent-appellant.

OPINION

HOWARD, Judge.

This appeal presents two questions for review: (1) whether the presumption of legitimacy of a child born during wedlock was overcome and (2) whether it was error to deny appellant's motion for a new trial.

Pursuant to Rule 11(c), Arizona Rules of Civil Appellate Procedure, a narrative statement of evidence presented below has been substituted for a reporter's transcript. The Coffmans were married in Germany in 1962 and the husband, as a member of the U.S. armed forces, served in various parts of the world from 1962 to 1975. They were

living in Germany during the time a child, John Burnam Coffman, was conceived. He was born in Germany on October 12, 1976.

The husband filed a petition for dissolution of marriage on November 29, 1976, alleging, inter alia, that the parties had two children, Ethel and Jimmy. The wife was served by registered mail in Germany and the proceedings were stayed pursuant to the Soldiers' and Sailors' Civil Relief Act. In July, 1977 the wife wrote a letter from Germany to the Cochise County clerk stating that it would be impossible for her to appear in court on a scheduled date because she had no funds. She requested a postponement until she could afford to return to the United States or get a lawyer in Arizona. She stated in the letter:

"I am living with my parents who are retired and could not afford to feed me, my daughter and son. I want a divorce but I don't want him to have the custody of our kids."

Counsel was appointed to represent the wife but she did not appear to testify at the trial. The only testimony was that of the husband. According to him, he had had no sexual relations with the wife after November 21, 1975. He remembered that date because he had noted it on a calendar he kept at the time. (The calendar was admitted into evidence.) According to the husband, he made the notations on the calendar after he suspected his wife of having sexual relations with another man, S. F. C. John Burnam Scrivner. He also testified that at that time they were experiencing martial discord and he believed his wife was seeing other men.

Mr. Coffman recalled that his wife would travel to other parts of Germany for weekend meetings with lovers. In April or May, 1976, he located her car at a motel in another city in Germany. He recognized another car which belonged to Scrivner and caught a glimpse of his wife and Scrivner in the motel dining room. Jimmy Coffman, who was then about 13 years old, testified that during January or February, 1976, he frequently saw his mother and Scrivner showing affection towards each other. He observed them kissing and holding hands when Mr. Coffman was on duty or working at a second job.

The trial court determined that the child, John Burnam Coffman, was not the minor child of Mr. Coffman and therefore made no provision for his support in the dissolution decree.

■ The rule in Arizona is that the husband must be presumed to be the father of a child born in wedlock if he had such access to his wife that he cou'd be the father by the laws of nature. *State v. Mejia*, 97 Ariz. 215, 399 P.2d 116 (1965). This presumption of legitimacy is not conclusive but is overcome when rebutted by clear and convincing evidence. *Anonymous v. Anonymous*, 10 Ariz.App. 496, 460 P.2d 32 (1969). The presumption of legitimacy shifted the burden of persuasion to Mr. Coffman and therefore we must decide whether he clearly and convincingly established that he was not the father of the child born in October, 1976. *Pyeatte v. Pyeatte*, 21 Ariz.App. 448, 520 P.2d 542 (1974).

■ The presumption of legitimacy may be overcome by proper and sufficient evidence showing that during the period when conception, in the course of nature, must have taken place the husband did not have sexual intercourse with his wife. *Clark v. State*, 208 Md. 316, 118 A.2d 366 (1955); Annot. 57 A.L.R.2d 729, 745; 10 Am.Jur.2d Bastards Sec. 23 (1963).

■ The only evidence of non-access was Mr. Coffman's testimony that from November 21, 1975, as noted on the calendar kept by him, he had had no sexual relations with his wife. The trial court apparently believed him and in view of the fact that the mother had named the child after Scrivner concluded that Scrivner and not Mr. Coffman was the child's father. Although Mr. Coffman was an interested party, the trial court could accept his uncontradicted testimony where no evidence was presented which impugned its veracity, *Graham v. Vegetable Oil Products Co.*, 1 Ariz.App. 237, 401 P.2d 242 (1965), even though this is a paternity case.

The "Lord Mansfield rule" precludes a husband or wife from testifying as to non-

access in order to establish non-paternity of a child born in wedlock. Mansfield's famous declaration was made in 1777 in an ejectment case where the issue of legitimacy of the claimant was raised:

"[T]he declarations of a father or mother cannot be admitted to bastardize the issue born after marriage.

\* \* \* \* \* \*

"[I]t is a rule founded in decency, morality, and policy, that they shall not be permitted to say after marriage that they have had no connection, and therefore that the offspring is spurious." *Goodright ex dem. Stevens v. Moss*, 2 Cowp. 591 at 592 and 594, 98 Eng.Rep. 1257 (K.B.1777).

According to Dean Wigmore the rule traveled to the United States in the treatises of the early 1800's and was accepted by most courts unquestioningly. He also states that Mansfield's rule was without precedential authority, save the twisted rendering of the then rule that in filiation proceedings a wife's testimony against a man not her husband must be corroborated by other evidence. 7 Wigmore, Evidence Sec. 2063 (Chadbourne rev. 1978).

The Mansfield rule of exclusion has been characterized as the prevailing or majority rule on the subject. Annot. 49 A.L.R.3d 212 Sec. 2. Some courts, on the other hand, have refused to follow it. E. g. *Vasquez v. Esquibel*, 141 Colo. 5, 346 P.2d 293 (1959); *Gibbons v. Maryland Casualty Company*, 114 Ga.App. 788, 152 S.E.2d 815 (1966); *Alber v. Alber*, 93 Idaho 755, 472 P.2d 321 (1970); *Ventresco v. Bushey*, 159 Me. 241, 191 A.2d 104 (1963); *Shelley v. Smith*, 249 Md. 619, 241 A.2d 682 (1968); *Melvin v. Kazhe*, 83 N.M. 356, 492 P.2d 138 (1971); *Commonwealth ex rel. Leider v. Leider*, 434 Pa. 293, 254 A.2d 306 (1969); *Davis v. Davis*, 521 S.W.2d 603 (Tex.1975); *State v. Schimschal*, 73 Wash.2d 141, 437 P.2d 169 (1968).

■ We believe that the Mansfield rule is an anachronism and hold that Mr. Coffman was competent to testify as to non-access. The following statement of Justice Roberts, concurring in *Leider*, is apropos:

"For the law to exclude the very evidence which may go to the heart of the issue in controversy on the basis of a public policy which has ceased to exist is to blind ourselves to the realities of today. In the early 18th century the presumption of legitimacy was conclusive and *no* evidence which would tend to bastardize the child born to a married couple was permitted to refute this conclusive presumption. . . . But that was a rule for an era in which a child once considered illegitimate had no capacity to become legitimatized; the harshness of illegitimacy at common law required a rule which would protect a child born to a married mother, regardless of who the father was.

Today our laws are much more considerate of the status of illegitimacy; some states [such as Arizona] have abolished the status entirely; in all states a child may be subsequently legitimated; in most states illegitimate children have the same legal rights as legitimate offspring, . . .; even the social stigma attaching to the illegitimate status is less than in an earlier day. To reflect this change in attitude a rule other than one which would exclude the most relevant and compelling evidence is needed. And we need not search far for such a rule which will still reflect a desire to uphold the legitimacy of all children born to married women but at the same time recognize *actual* parenthood when the contrary holding would offend our sense of justice." 254 A.2d at 309–310 (citations omitted).

■ The uncontradicted evidence before the trial court established Mr. Coffman's non-access to his wife during the time of conception, thus rebutting the presumption of legitimacy.

Affirmed.

RICHMOND, C. J., and HATHAWAY, J., concurring.